**INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, Appellant,**

v.

**WASHINGTON TERMINAL COMPANY.**

**No. 24880.**

United States Court of Appeals,
District of Columbia Circuit.

Argued April 14, 1972.

Decided Dec. 19, 1972.

Certiorari Denied March 26, 1973.
See 93 S.Ct. 1530.

---

3. During these proceedings Air Southwest's name was changed to Southwest Airlines Company.

Mr. Harold A. Ross, Cleveland, Ohio, with whom Mr. E. Victor Willets, Jr., Washington, D. C., was on the brief, for appellant.

Mr. Stephen A. Trimble, Washington, D. C., with whom Mr. Nicholas D. Ward, Washington, D. C., was on the brief, for appellee.

Before TAMM and MacKINNON, Circuit Judges, and RONALD N. DAVIES,* United States Senior District Judge for the District of North Dakota.

MacKINNON, Circuit Judge:

The International Brotherhood of Electrical Workers (IBEW or Electricians) brings this appeal from an order entered by the District Court, on October 19, 1970, denying a preliminary injunction against the Washington Terminal Company (Company) in a railway labor dispute. The origin of the dispute lies in that round of contract negotiations between the Nation's railroads and four of the six railroad shop craft unions [1] which was ultimately concluded only upon enactment by Congress of Public Law 91–226 on April 9, 1970.[2]

Public Law 91–226 placed into effect— "as though arrived at by agreement of the parties under the Railway Labor

---

* Sitting by designation pursuant to 28 U.S. C. § 294(d) (1970).

1. At the time of these negotiations the "standard railroad" was composed of employees represented by nineteen (19) separate labor organizations. Six of these nineteen unions represent those employees who perform the bulk of the maintenance and repair functions on the railroads' operating equipment; these are the so-called "shop craft unions." The four shop craft unions that were involved in the negotiations leading to the present dispute were the IBEW (or Electricians), the International Association of Machin-

ists and Aerospace Workers (IAM, or Machinists), the International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers (IBBB, or Boilermakers and Blacksmiths), and the Sheet Metal Workers International Association (SMWI, or Sheet Metal Workers). The two shop craft unions who did not participate in these negotiations were the Brotherhood of Railway Carmen (BRC, or Carmen), ànd the International Brotherhood of Firemen and Oilers (Firemen).

2. Pub.L. 91–226, April 9, 1970, 84 Stat. 118 (1970); *see* n. 14, *infra.*

Act"—a Memorandum of Understanding (hereinafter Memorandum) relating to the dispute between the parties that had been agreed to by the bargaining representatives of all four parties to the negotiation, but which had failed of ratification by the membership of one of the unions, the Sheet Metal Workers. This Memorandum included an "incidental work rule" by which the bargaining representatives of the unions agreed, subject to ratification by their respective members, to relax the formerly rigid classification of work rules to the extent of permitting a carefully limited crossing of normal craft lines at "running repair work locations" on the Nation's railroads for the performance of tasks "incidental" to a "main work assignment." [3]

Following the enactment of Public Law 91–226 the railroads concluded a national agreement with the Brotherhood of Railway Carmen (Carmen), one of the other shop craft unions, containing an identically phrased "incidental work rule." Shortly after consummation of this agreement with the Carmen the Washington Terminal Company began assigning "incidental work" normally falling within the Electricians' classification to employees belonging to the Carmen's union. The Electricians immediately complained to the Company and, after direct discussions had led to no satisfactory resolution, this suit was initiated by the IBEW (Electricians) on September 15, 1970. The objective

of the litigation is to prevent the Company from continuing to use Carmen to perform any incidental work of Electricians. On September 29, the District Court denied a temporary restraining order, and after hearing oral argument on October 6, the District Judge ruled from the bench that a preliminary injunction against the Company was not warranted. An order formally stating that conclusion was entered October 19, and this appeal followed. We believe the request for preliminary injunction was properly denied and accordingly we affirm the order of the District Court.

## I.

A. *National Negotiations Leading to Passage of Public Law 91–226* [4]

This dispute represents another episode in the long-running struggle over work rules between the nation's railroads and the labor organizations who represent railroad employees. Negotiations were initiated in November 1968 when four of the shop craft unions—the Machinists, Electricians, Boilermakers and Sheet Metal Workers (IAM, IBEW, IBB and SMWI)—and the railroads exchanged notices pursuant to section 6 of the Railway Labor Act.[5] The unions' notices requested only increases in wage rates; the railroads' notices proposed a broad range of changes in work rules, including a rule which would eliminate work classification distinctions between the four unions and create, in essence, a

---

3. *See* note 8 *infra* and accompanying text for the complete text of the rule and a more complete discussion of the agreement thereto.

4. A chronology of this dispute is provided as an Appendix to this opinion.

5. Railway Labor Act of 1926, § 6, ch. 347, 44 Stat. 582, as amended, 45 U.S.C. § 156 (1970). Section 6 provides:
   Carriers and representatives of the employees shall give at least thirty days' written notice of an intended *change in agreements* affecting rates of pay, rules, or working conditions, and the time and place for the beginning of conference between the representatives of the parties interested in such intended changes shall be agreed upon within ten

days after the receipt of said notice, and said time shall be within the thirty days provided in the notice. In every case where such notice of intended change has been given, or conferences are being held with reference thereto, or the services of the Mediation Board have been requested by either party, or said Board has proffered its services, rates of pay, rules, or working conditions shall not be altered by the carrier until the controversy has been finally acted upon, as required by section 155 of this title, by the Mediation Board, unless a period of ten days has elapsed after termination of conferences without request for or proffer of the services of the Mediation Board. (Emphasis added.)

composite mechanic's classification. Bargaining on these proposals proceeded through the entire range of procedures provided by the Railway Labor Act,[6] with the only appreciable progress coming through Emergency Board No. 176's recommendations for narrowing the issues to be resolved.

Having exhausted the procedures of the Act,[7] and in a last ditch attempt to avoid the consequences of a nationwide rail strike, intensive bargaining through the mediation efforts of the Department of Labor was commenced. The major breakthrough in these negotiations occurred when the Unions presented a draft of an "incidental work rule" in substantially the same form as it appeared in the final memorandum. Following this dramatic shift in the unions' position the carriers responded with significantly increased wage offers and a Memorandum of Understanding was reached and initialed by all parties on December 4, 1969. However, by prior agreement among the unions this Memorandum was submitted to each union's membership for ratification with the understanding that all four unions must

ratify or none would sign a formal contract embodying the terms of the Memorandum. On December 17, the ratification votes were announced; the Sheet Metal Workers had rejected the agreement.

The key to this agreement, the source of dissatisfaction to the Sheet Metal Workers, and the source of the dispute before us here, was the "incidental work rule."

### The Incidental Work Rule

The principal part of the rule provides [8]:

At running repair work locations which are not designated as outlying points where a mechanic or mechanics of a craft or crafts are performing a work assignment, the completion of which calls for the performance of "incidental work" (as hereinafter defined) covered by the classification of work rules of another craft or crafts, such mechanic or mechanics may be required, so far as they are capable, to perform such incidental work provided it does not comprise a preponderant part of the total amount

---

6. These procedures of the Railway Labor Act were summarized by Mr. Justice Harlan in Brotherhood of R. R. Trainmen v. Jacksonville Terminal Co., 394 U.S. 369, 378, 89 S.Ct. 1109, 1115, 22 L. Ed.2d 344 (1969):

The Act provides a detailed framework to facilitate the voluntary settlement of major disputes. A party desiring to effect a change of rates of pay, rules, or working conditions must give advance written notice. § 6. The parties must confer, § 2 Second, and if conference fails to resolve the dispute either or both may invoke the services of the National Mediation Board, which may also proffer its services *sua sponte* if it finds a labor emergency to exist. § 5 First. If mediation fails, the Board must endeavor to induce the parties to submit the controversy to binding arbitration, which can take place, however, only if both consent. §§ 5 First, 7. If arbitration is rejected and the dispute threatens "substantially to interrupt interstate commerce to a degree such as to deprive any section of the country of essential transportation service, the

Mediation Board shall notify the President," who may create an emergency board to investigate and report on the dispute. § 10. While the dispute is working its way through these stages, neither party may unilaterally alter the *status quo.* §§ 2 Seventh, 5 First, 6, 10.

Nowhere does the text of the Railway Labor Act specify what is to take place once these procedures have been exhausted without yielding resolution of the dispute. Implicit in the statutory scheme, however, is the ultimate right of the disputants to resort to self-help— "the inevitable alternative in a statutory scheme which deliberately denies the final power to compel arbitration." Florida E. C. R. R. v. Railroad Trainmen, 336 F.2d 172, 181 (1964). . . .

7. See Chronology in the Appendix.

8. A second paragraph dealt with procedures to be followed in the event of a dispute over whether or not the alleged "incidental work" comprises a "preponderant part" of the work assignment.

of work involved in the assignment. Work shall be regarded as "incidental" when it involves the removal and replacing or the disconnecting and connecting of parts and appliances such as wires, piping, covers, shielding and other appurtenances from or near the main work assignment in order to accomplish that assignment. Incidental work shall be considered to comprise a preponderant part of the assignment when the time normally required to accomplish it exceeds the time normally required to accomplish the main work assignment. In no instance will the work of overhauling, repairing, modifying or otherwise improving equipment be regarded as incidental.

The carriers considered this rule to be both a major milestone in their efforts to achieve more efficient utilization of manpower, and the quid pro quo essential to the wage increases they had offered. The Sheet Metal Workers were unwilling to consider any lower wages than those offered, yet their opposition to the incidental work rule was so implacable that they contended no wage increase would be sufficient to induce them to accept the rule.

Faced with these respective bargaining positions, further Labor Department mediation efforts were futile and the parties prepared to resort to self-help. The unions struck the Union Pacific on January 31, 1970; the railroads promptly announced a nationwide lockout to take effect at 10:00 p. m. the same date; and both parties brought suit in the United States District Court for the District of Columbia seeking to restrain the action of the other. Temporary restraining or-

ders were entered that afternoon halting the strike and forestalling the lockout.[9] These orders were subsequently extended through March 2, when a preliminary injunction against selective strikes by the unions was issued.[10]

Negotiations sponsored by the Labor Department continued during this period, with two significant changes taking place. Recognizing the implacable opposition of the Sheet Metal Workers to the agreement reached in December, the other three unions—Electricians, Machinists and Boilermakers—offered to sign a contract embodying the terms of the Memorandum without the Sheet Metal Workers joining. When the carriers rejected this offer, the Carmen indicated their willingness to sign such a contract and the representatives of the three other unions offered to replace the Sheet Metal Workers with the Carmen and sign the contract with those four unions. This proffered agreement without the Sheet Metal Workers was also rejected by the carriers. Meanwhile, the Sheet Metal Workers withdrew authority from the national union bargaining team to represent them, and they declared that any further negotiations would have to be conducted with one of their own officers.

When the District Court announced its injunction against selective strikes on March 2, 1970, all of the original four unions declared their intention to commence a nationwide rail strike at midnight on March 4th. The President responded to this threat to the nation's economic well-being by requesting legislation from Congress that would place the December 4, 1969 Memorandum of Understanding into effect as the contract between the parties.[11] Congress,

9. Int'l Ass'n of Machinists v. Nat'l Ry. Labor Conf., 310 F.Supp. 904 (D.D.C. 1970).

10. *Id.* This opinion denied as moot the requested injunctive relief against the railroads' threatened lockout, since the lockout had been intended solely as a retaliatory measure against "whipsaw" selective strikes by the unions.

11. PRESIDENTIAL MESSAGE
*To the Congress of the United States:*
   Once again this nation is on the brink of a nationwide rail strike.
   A nationwide stoppage of rail service would cause hardship to human beings and harm our economy, and must not be permitted to take place.
   In two previous disputes, when the railroad employers and unions have not been

however, was unwilling, on such short notice, to force a contract on the still recalcitrant Sheet Metal Workers. Thus Public Law 91–203,[12] enacted on March 4, 1970, froze the existing situation by prohibiting either a strike or a lockout prior to April 11, 1970.

■ During the next month further negotiations were held under the mediation efforts of both the Labor Department and members of Congress. The Sheet Metal Workers union remained adamant in its opposition to the incidental work rule and the railroads refused to budge from their insistence that the wage increases offered were immutably tied to that rule and that any agreement must cover all four of the unions that were the original parties to the dispute. Recognizing this impasse, both the House and Senate committees considered the limited range of alternatives available to them and ultimately recommended passage of the President's March 3rd proposal.[13] On April 9, 1970, Senate Joint Resolution 91–190 was enacted as Public Law 91–226. The operative language of the Joint Resolution provided:

*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,* That the memorandum of understanding, dated December 4, 1969, shall have the same effect (including the

---

able to settle their differences, the President has recommended, and the Congress has enacted, special legislation to avert a stoppage. I am taking similar action to protect the public interest today.

The legislation I propose is closely related to the facts of this dispute. After all the procedures of the Railway Labor Act had been exhausted, and after extensive mediation under the auspices of the Secretary of Labor, the parties finally reached an agreement incorporated in a Memorandum of Understanding dated December 4, 1969. That Memorandum was ratified by an overall majority of all the members voting as well as by the majority of those voting in three of the four unions.

However, the majority of the voting members of one union, the Sheetmetal Workers' International Association, failed to ratify the Memorandum. I am forwarding to you today *legislation that merely makes that Memorandum the contract between the parties.* We must not submit to the chaos of a nationwide rail stoppage because a minority of the affected workers rejected a contract agreed to by their leadership. The public interest comes first.

Four days ago, I sent to the Congress a measure to protect the public interest in cases where a strike or lockout in the transportation industry imperils the national health and safety. In that message I stressed two principles: first, that the health and safety of the Nation must be protected against damaging work stoppages; second, that collective bargaining should be as free as possible from Government interference.

The legislation I am submitting with this message to resolve this dispute,

abides by those two principles. We will protect the national interest, and we will limit Government interference to enforcing the contract to which responsible agents of the parties agreed.

I urge the Congress to act quickly on my proposal, so that a crippling stoppage * * * can be averted and the Nation's travelers and shippers can depend on uninterrupted service.

RICHARD NIXON.
THE WHITE HOUSE, *March 3, 1970.*
U. S. DEPARTMENT OF LABOR,
OFFICE OF THE SECRETARY,
*Washington, D.C., March 3, 1970.*
HON. JOHN W. McCORMACK,
*Speaker of the House of Representatives, Washington, D.C.*

DEAR MR. SPEAKER: I am transmitting herewith draft legislation to carry out the President's recommendations for averting the threatened nationwide railroad dispute.

*The draft legislation provides that the memorandum of understanding agreed to by the carriers and the representatives of the shop craft unions shall have the effect of a contract between the parties.*

In view of the urgency of the situation, I recommend that this matter be given immediate and favorable consideration.

Sincerely,

GEORGE P. SHULTZ,
*Secretary of Labor.*
H.R.Rep.No.91–984, 91st Cong., 2d Sess. 4–5 (1970) (Emphasis added).

12. 84 Stat. 22.

13. S.Rep.No.91–758, 91st Cong., 2d Sess. (1970); H.R.Rep.No.91–984, 91st Cong., 2d Sess. (1970).

preclusion of resort to either strike or lockout) as though arrived at by agreement of the parties under the Railway Labor Act (45 U.S.C. § 151 et seq.) and that February 19, 1970, shall be deemed the "date of notification of ratification" as used in this memorandum of understanding.[14]

That a joint resolution was used to accomplish the intended result does not detract from the legislative character of the action. Congress legislates through "acts" and "joint resolutions."[15] Resolutions are recognized in the Constitution,[16] and a joint resolution is a bill within the meaning of the congressional rules and the processes of the Congress.[17] With the exception of joint resolutions proposing amendments to the Constitution,[18] all such resolutions are sent to the President for approval and have the full force of law. They are ordinarily used for what may be called the incidental, unusual, or inferior purposes of legislating but are used as well for the highest style of legislation—proposing amendments to the Constitution and abrogating treaties.[19]

### B. Local Events Subsequent to Public Law 91–226

Upon passage of Public Law 91–226 the Washington Terminal Company be-

14. Pub.L. 91–226, 84 Stat. 118. The full text of the Resolution is as follows:

JOINT RESOLUTION

To provide for the settlement of the labor dispute between certain carriers by railroad and certain of their employees.

Whereas the labor dispute between the carriers represented by the National Railway Labor Conference and certain of their employees represented by the International Association of Machinists and Aerospace Workers; International Brotherhood of Boilermakers, Iron Shipbuilders, Blacksmiths, Forgers and Helpers; Sheet Metal Workers' International Association; International Brotherhood of Electrical Workers functioning through the Employees' Conference Committee, labor organizations, threatens essential transportation services of the Nation; and

Whereas all the procedures for resolving such dispute under the Railway Labor Act have been exhausted; and

Whereas the representatives of all parties to this dispute reached agreement on all outstanding issues and entered into a memorandum of understanding, dated December 4, 1969; and

Whereas the terms of the memorandum of understanding, dated December 4, 1969, were ratified by the overwhelming majority of all employees voting and by a majority of employees in three out of the four labor organizations party to the dispute; and

Whereas the failure of ratification resulted from the concern of a relatively small group of workers concerning the impact of one provision of the agreement; and

Whereas this failure of ratification has resulted in a threatened nationwide cessation of essential rail transportation services; and

Whereas the memorandum of understanding, dated December 4, 1969, permits the service of notices or proposals for changes under the Railway Labor Act on September 1, 1970, to become effective on or after January 1, 1971; and

Whereas the national interest, including the national health and defense, requires that transportation services essential to interstate commerce is maintained; and

Whereas the Congress finds that an emergency measure is essential to security and continuity of transportation services: Now, therefore, be it

Resolved by the Senate and House of Representatives of the United States of America in Congress assembled, That the memorandum of understanding, dated December 4, 1969, shall have the same effect (including the preclusion of resort to either strike or lockout) as though arrived at by agreement of the parties under the Railway Labor Act (45 U.S.C. § 151 et seq.) and that February 19, 1970, shall be deemed the "date of notification of ratification" as used in this memorandum of understanding.

15. IV Hind's Precedents of the House of Representatives § 3371 (1907).

16. U.S.Const. Art. I, § 7, cl. 3.

17. Jefferson's Manual and Rules of the U. S. House of Representatives § 397, p. 186 (1971). IV Hind's Precedents, supra, § 3375.

18. V Hind's Precedents, supra, § 7029.

19. IV Hind's Precedents, supra, § 3372; Jefferson's Manual, supra, §§ 393, 599, pp. 186, 293. For the general practices with respect to the use of joint resolutions, see IV Hind's Precedents, supra, §§ 3370–3373.

gan assigning incidental work among members of the four unions whose representatives had initialed the December 4, 1969 memorandum. The Company also, bargaining nationally along with the other railroads, signed an agreement with the Carmen that contained an incidental work rule that was identical to the rule in the Memorandum of Understanding that Congress had passed into effect by Public Law 91–226. Shortly after April 24, 1970, when this agreement with the Carmen took effect, the Company assigned as incidental work under the rule some electrical work to carmen.

On May 1, Mr. S. A. Lloyd, General Chairman of the Electricians' local at the Company, filed a time claim, contending that "This work properly belongs to the electricians." App. 57.[20] The Company denied this claim in a letter dated May 28 from Mr. J. E. McCabe, Master Mechanic, on the ground that the work was properly performed in accordance with the incidental work rule contained in the agreement implemented by Public Law 91–226. App. 56.

The following day, May 29, Mr. Lloyd wrote the Manager of the Company as follows:

The practice of assigning work belonging to electricians at the car shop to the Carmen's Craft is in violation of Title I, Section 2, Paragraph 7 of the Railway Labor Act and constitutes a major dispute.

Unless this practice is stopped, it will be necessary to resort to self help.

App. 12.[21] Upon receipt of this strike threat, a meeting with Mr. Lloyd was arranged. The Company explained its contention that the dispute was a "minor" one concerning interpretation of the incidental work rule, and urged Mr. Lloyd to follow the procedures mandated by Section 3 of the Railway Labor Act.[22] However, the Company agreed to stop assigning incidental work to carmen pending a further meeting of national bargaining representatives of the railroads and the four unions who were parties to the December 4, 1969 memorandum. That meeting was scheduled for July 8, 1970.

---

20. The notation "App." is used to refer to the Appendix to the briefs submitted by the parties on this appeal.

21. Section 2, Seventh of the Railway Labor Act, as amended, 45 U.S.C. § 152 (1970) provides:

*Change in pay, rules, or working conditions contrary to agreement or to section 156 forbidden*

Seventh. No carrier, its officers, or agents shall change the rates of pay, rules, or working conditions of its employees, as a class, as embodied in agreements except in the manner prescribed in such agreements or in section 156 of this title.

22. Section 3 of the Act, 45 U.S.C. § 153 (1970), sets forth the procedures for resolution of grievances, contract interpretation, and other "minor disputes." These procedures include a form of binding arbitration through the National Railroad Adjustment Board. The Second Division of that Board consists of ten members, five of whom are selected by the carriers and five by the national labor organizations of the employees, and the jurisdiction of this division extends to disputes involving the shop crafts. 45

U.S.C. § 153, first (h). 45 U.S.C. § 153, subd. 1(i) provides:

(i) The disputes between an employee or group of employees and a carrier or carriers growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions, including cases pending and unadjusted on June 21, 1934, shall be handled in the usual manner up to and including the chief operating officer of the carrier designated to handle such disputes; but, failing to reach an adjustment in this manner, the disputes may be referred by petition of the parties or by either party to the appropriate division of the Adjustment Board with a full statement of the facts and all supporting data bearing upon the disputes.

The statute further provides "That . . . final awards [by any division of the Adjustment Board] as to any such dispute. . . ." (45 U.S.C. § 153, first (k)) "shall be final and binding upon both parties to the dispute. . . ." (45 U.S.C. § 153, first (m)). *See* Part IV of this opinion, *infra*, for further description and discussion of these procedures.

At approximately the same time as the conference between Mr. Lloyd and the Washington Terminal Company, the Southern Pacific began assigning incidental electrical work to carmen. The Electricians' local at that railroad protested, and after a conference failed to resolve the dispute the union announced that a strike of the Southern Pacific would take place on June 29, 1970. On that date the United States District Court for the Eastern District of California issued a restraining order, followed on July 9, 1970 with a preliminary injunction against the union.[23] In the order granting that injunction the United States District Court in California found that

> the disputes and grievances which are the basis of defendant's strike do not concern changes in agreements, but instead concern the interpretation and application of existing agreements covering rates of pay, rules and working conditions and are minor disputes for which defendants have an appropriate administrative procedure for handling with plaintiff.

App. 67. Accordingly, the order was made conditional

> upon the submission of this dispute, within five (5) days of the date hereof, to the National Railroad Adjustment Board, or a Public Law Board [24] as provided for in the Railway Labor Act.

App. 69. The Southern Pacific subsequently submitted the dispute to the Adjustment Board, where it remains pending at this date.[25]

The July 8 meeting of the national bargaining representatives failed to achieve any further clarification or agreement concerning the incidental work rule. However, relying in large part on the fact that the District Court in the Southern Pacific litigation did not require that railroad to stop using carmen to perform incidental work, Washington-Terminal informed Mr. Lloyd that the Company intended to resume the practice of assigning incidental work to carmen. Approximately 17 such assignments were made from August 3–September 14, 1970. App. 63.

This case was initiated on September 15, 1970 when the Electricians Union (IBEW) filed its complaint requesting declaratory and injunctive relief against the Company's use of anyone other than members of the Machinists, Boilermakers or Sheet Metal Workers unions to perform incidental work in the craft of electrical work. After denying a requested temporary restraining order on September 29, argument was heard on the Union's motion for a preliminary injunction on October 6, 1970. At the conclusion of this hearing the District Court ruled from the bench, denying the requested injunction and on October 19, 1970 filed written findings, conclusions

---

23. Southern Pac. Transp. Co. v. IBEW, Civ. No. S–1699 (E.D.Cal., July 9, 1970).

24. The term "Public Law Board" is not used in the statute but refers generally to those special boards of adjustment authorized by 45 U.S.C. § 153, Second. These boards which generally come into existence by mutual agreement of the parties to decide system, group or regional issues, perform the same function as the Adjustment Board, but are composed of three members and generally operate as a subordinate version of the National Railroad Adjustment Board. *See generally,* 48 Am.Jur.2d Labor and Labor Relations § 1145 (1970).

25. On July 31, 1970, the Electricians filed an answer and counterclaim in the Southern Pacific litigation. The counterclaim was virtually a verbatim copy of the complaint in this action. The District Court heard argument on the counterclaim on August 17, and denied it from the bench on October 5—the day before the hearing in the District Court on the case before us here. Upon request of the Electricians a written order was entered on November 6. IBEW has appealed both the order granting preliminary injunction and the order denying its counterclaim; these appeals are docketed as Nos. 26,696 and 71–1390 in the U. S. Court of Appeals for the Ninth Circuit.

and an order denying the preliminary injunction.[26]

The denial, as formulated in the written findings of October 19, 1970,[27] was based on the District Court's assessment that the Electricians had not shown a probable likelihood of ultimate success on the merits to warrant an injunction. Three factors were singled out as leading to this conclusion:

First, that the Company's implementation of the "incidental work rule" under its agreement with the Carmen and under Public Law 91–226 implementing the Memorandum of Agreement, and the electricians' challenge thereto, involves a "minor dispute" only and not a change in agreement.

Second, that the electricians had an adequate administrative remedy for the resolution of the issue by the National Railroad Adjustment Board.

Third, that if the District Court were to interpret the Act it would hold that Congress intended the Memorandum of Agreement to apply "across the board," as opposed to a limited application to only those [four] . . craft unions involved in the negotia-

---

26. The transcript of this ruling may be found at App. 73–74. The order itself, including the formal findings of fact and conclusions of law, provided:

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION.
(Filed October 19, 1970.)

Upon consideration of the Motion of plaintiff for a Preliminary Injunction and the Opposition of the defendant thereto, and upon further consideration of the record and file in this cause, including the various affidavits and exhibits, together with the arguments of counsel in open Court, the Court hereby makes the following:

FINDINGS OF FACT

1. That the defendant's implementation of the "incidental work rule" contained in the Memorandum of Understanding of December 4, 1969, as implemented by Public Law 91–226, and the plaintiff's challenge thereto does not involve a change in an agreement, but instead involves a question of the interpretation and application of an existing agreement covering rates of pay, rules and working conditions;

2. That the plaintiff has an adequate administrative remedy for the resolution of the issue raised herein pursuant to the provisions of the Railway Labor Act, 45 U.S.C. § 151, et seq., and more particularly pursuant to 45 U.S.C. § 153 First (i). In this respect, the Court finds that the National Railroad Adjustment Board would be particularly qualified to handle a dispute of the type involved herein.

3. That assuming *arguendo* that the question of coverage of the Memorandum of Understanding, implemented by Public Law 91–226, was a proper one for construction by the Court, it would appear that the Court would find that the intent of the Congress assumed a broad coverage of the same, as opposed to a limited application to only those several shop craft unions involved in the negotiations culminating in said Memorandum of Understanding.

4. That in related litigation, the United States District Court for the Eastern District of California (in Southern Pacific Transportation Company v. International Brotherhood of Electrical Workers, et al. Civil No. S–1699) has found the dispute to involve the interpretation and application of an existing agreement, and ordered the dispute submitted to the National Railway Adjustment Board, which has been done by the carrier in that case.

5. That by virtue of the foregoing, plaintiff has failed to show a probable likelihood of ultimate success in this litigation.

CONCLUSIONS OF LAW

1. That the issue presented herein constitutes a "minor dispute" within the meaning of the Railway Labor Act, 45 U.S.C. § 151 et seq., which provides an appropriate and exclusive forum for the resolution thereof.

2. That plaintiff has failed to make the requisite showing that would entitle it to the extraordinary relief which it seeks.

ORDER

Upon consideration of the foregoing Findings of Fact and Conclusions of Law, it is, by the Court, this 19 day of October, 1970.

ORDERED, that the Motion of the plaintiff for a Preliminary Injunction be, and the same is hereby denied.
App. 75–76.

27. *See* n. 26.

tions culminating in [the] . . . Memorandum of Understanding."

In addition the court found the similar conclusions of the United States District Court in California in the Southern Pacific case to be quite persuasive.

■ We affirm the order denying injunctive relief on the sole ground that the dispute is one which should be resolved under the "minor dispute" procedures of the Railway Labor Act. With this independent ground for affirmance, we need not decide the issues presented by the arguments of the parties concerning the proper interpretation of the Memorandum of Agreement or the precedential role of the Southern Pacific decision in the District Court's consideration of this case.

## II

■ This court has recently considered the scope of our review of orders pertaining to preliminary injunctions in Delaware & H. Ry. v. United Transp. Union, 146 U.S.App.D.C. 142, 158–161, 450 F.2d 603, 619–622 (1971). We discussed there the particular importance of the trial court's assessment of the movant's probability of success on the merits, and we noted that frequently the finding of irreparable injury on which an injunction is based "depends on an appraisal of the validity, or at least the probable validity, of the legal premise underlying the claim of right in jeopardy of impairment." 146 U.S.App. D.C. at 158–159, 450 F.2d at 619–620. This is such a case, for the Electricians contend that the Company's assignment of incidental electrical work to Carmen is a unilateral change in major conditions of employment which can only be made under the section 6 notice and negotiation procedures of the Railway Labor Act. The District Court concluded that

the Electricians were unlikely to be able to establish the validity of that legal premise in a trial on the merits, because while the assignment of incidental electrical work to the Carmen was a change from the practices permitted under the old agreements, it did not constitute a change from practices that were arguably permitted by the incidental work rule as set forth in the Understanding implemented by Congress and in the Agreement with the Carmen. Actually the unilateral change in major conditions of employment was made previously by Congress when it implemented the Memorandum of Agreement by legislation not by the railroad when it acted in conformance therewith. In Delaware & H. Ry. we held:

> Insofar as the action of the trial judge on a request for preliminary injunction rests on a premise as to the pertinent rule of law, that premise is reviewable fully and de novo in the appellate court. The matter stands in a different posture from that involved when there is no question or disagreement as to the legal principle involved, and the element of probability of success on the merits depends on a forecast as to the shape of the facts likely to emerge at trial. If the appellate court has a view as to the applicable legal principle that is different from that premised by the trial judge, it has a duty to apply the principle which it believes proper and sound.

146 U.S.App.D.C. at 159, 450 F.2d at 620.

## III

■■ One of the reasons the District Court found the Electricians' chances of success on the merits to be doubtful was its conclusion that if it were to interpret Public Law 91–226 [28] it would be re-

28. The legislative history of Public Law 91–226 includes the materials related to Public Law 91–203, the measure enacted on March 4, 1970 to delay the strike pending further negotiations and congressional consideration of alternatives for resolving the dispute. The earlier law was introduced as S.J.Res. 91–178 and H.J. Res. 91–1112, and was passed as S.J. Res. 91–180. Public Law 91–226 had been considered by the House as H.J.Res. 91–1124, and by the Senate as S.J.Res. 91–190. Three volumes of hearings were published. The House hearings of March

quired to hold that Congress intended the Act to apply not only to personnel of the four shop craft unions that were negotiating but also "across the board" to include personnel of the other two shop "craft" unions as well. App. 73. Thus, in the view of the trial court, the legal premise urged by the Electricians was barred by Public Law 91–226. We interpret the Railway Labor Act as conferring exclusive jurisdiction on the Adjustment Board to decide this question and hence conclude that the determination of this issue is not within the jurisdiction of the District Court.[29] The Electricians, however, contend that the issue should be judicially determined. Were we to do so on the record and arguments here presented we would agree with the general result reached by the trial court but we believe that neither the parties nor the court have articulated precisely the proper interpretation to be given to the incidental work rule as implemented by the Act and to the identical rule in the Carmen's agreement, as applied to the facts of this case.

The Electricians contend that the application of the incidental work rule should be restricted *completely* to the four signatory unions that initialed the original Memorandum because, they argue, it is part of Public Law 91–226 that was intended only to settle a labor dispute between the four unions and the carriers. We believe, however, that this is too narrow a view of the rule as im-

plemented by the Act. We recognize that the Act covers the four signatory unions completely, but we also consider that the provisions of the Memorandum of Agreement as originally initialed by the unions, and as implemented by congressional action, were intended to apply in some instances to the entire working relations of these four unions with the carriers and thus necessarily encompassed some of the working relations of the four signatory unions with the other shop crafts, and possibly others.

Under the operative provision of the "incidental work rule," as implemented by Congress, the four signatory crafts are deemed to have agreed that a

> mechanic of a craft . . . may be required, so far as they are capable, to perform . . . incidental work . . . covered by the classification of work rules of another craft or crafts . . . at running repair stations . . . . (Not in sequence.)

By these provisions the negotiators for the four shop craft unions agreed upon broad language that encompasses work situations involving "mechanics" and "crafts" generally and not just those "mechanics" and "crafts" who belonged to the four unions that initialed the original Memorandum. When this language was formulated by the parties in the original Memorandum neither side had any idea that an attempt would be made to restrict its application because it subsequently became involved in the set-

4, 23, 24, 25, and April 7, 1970 are published in one volume: Hearings on H.J. Res. 1112 and H.J.Res. 1124 Before the House Committee on Interstate and Foreign Commerce, 91st Cong., 2d Sess., Ser.No.91–47 (1970) (hereafter cited as House Hearings). The Senate hearing of March 4, 1970 was separately published as Hearing on S.J.Res. 178 Before the Senate Comm. on Labor and Public Welfare, 91st Cong., 2d Sess. (1970) (hereafter cited as Senate Hearing I). A second Senate hearing conducted on April 2, 1970 was separately published under exactly the same title as the first (hereafter cited as Senate Hearing II). Separate reports were published for each of the Laws that were subsequently passed:

the reports covering Pub.L. 91–203 are S.Rep.No.91–717, 91st Cong., 2d Sess. (1970), and H.R.Rep.No.91–868, 91st Cong., 2d Sess. (1970); and the reports behind Pub.L. 91–226 are S.Rep.No.91–758, 91st Cong., 2d Sess. (1970), and H.R.Rep.No.91–984, 91st Cong., 2d Sess. (1970). The floor debates accompanying passage of Pub.L. 91–226 may be found at 116 Cong.Rec. 10717–31 (House), 10775–81 (Senate) (1970).

29. Slocum v. Delaware, L. & W. R. R., 339 U.S. 239, 244, 70 S.Ct. 577, 94 L.Ed. 795 (1950); Order of Conductors v. Pitney, 326 U.S. 561, 66 S.Ct. 322, 90 L. Ed. 318 (1946).

tlement of a strike by the four participating unions. When the rule was first drafted (and its terminology has not been changed since) the parties contemplated a normal application of the rule to the normal operations of the railroad. Had the parties desired to limit the operation of the Memorandum to the bargaining "crafts," they could have easily done so by specific language. Failing to do so, the clear implication is that they did not intend their general provisions to be so restricted. There is thus nothing in the language of the agreement to restrict the meaning of "mechanic" or "craft" to members of the four shop craft unions that initialed the original Memorandum or to restrict the incidental work that can be compelled at running repair stations only to work of the four signatory crafts. The language used makes the rule a "two-way street" applicable to any person or incidental work that satisfies the "mechanic" and "craft" requirements. It would thus encompass incidental work of both the Electricians and the Carmen, which is the sole issue presented to this court.

In its argument the Electricians overly emphasize the fact that the Act was passed to stop a strike involving the four unions only and they generally ignore the plain meaning of the words used in the Memorandum. In our view, Public Law 91–226 only operates *compulsively* on the four signatory craft unions. By this we mean that only the four signatory unions could be *compelled* because of Public Law 91–226 to perform incidental work of other crafts and to allow other crafts to perform incidental work in their craft. However, the clear intent of the language used in the incidental work rule, to the extent that it was implemented by Public Law 91–226, requires personnel of the four signatory unions at running repair stations to perform incidental work in *all* the shop "crafts" and also requires them to allow *all* the shop "crafts" to perform incidental work in their "craft."

Conversely stated, the Understanding which the Act implements does not operate to *compel* personnel of the two non-signatory shop craft unions to perform incidental work in the other crafts or to compel the non-signatory unions to accede to other crafts performing incidental work in their craft. This interpretation is fortified by the fact that the carriers and the Carmen did voluntarily agree on an identical rule shortly after the passage of the Act. If the Act had covered all shop crafts *compulsorily* there would have been no necessity for the railroads to sign a separate agreement with the Carmen. Thus, prior to the time that the Carmen agreed to the incidental work rule, they were free to object to the other four shop crafts doing work in their craft under the incidental work rule as implemented by the Act and the Carmen could not be compelled to perform incidental work in the other crafts. But, when the Carmen signed the agreement containing an identical "incidental work rule" they placed themselves in the same position as the four signatory unions, without in any way changing the situation of the earlier signatory unions except that thereafter when the personnel of the original four signatory unions performed incidental work in the Carmen's craft, they would be doing incidental work that the Carmen had agreed they could do. In our view this is the plain meaning of the "incidental work rule" in Public Law 91–226 and the Carmen's agreement as applied to the Electricians and the Carmen.

So were we to construe the legislation and the Carmen's agreement we would reach the same result as the trial court. However, when Congress provided that the "Memorandum . . . shall have the same effect . . . as though arrived at by *agreement* of the parties under the Railway Labor Act" (P.L. 91–226), it obviously intended that jurisdiction to interpret the provisions of that Memorandum of Agreement would be in the Adjustment Board as with other "disputes . . . growing out of . . . the interpretation or application of agreements. . . ." 45 U.S.C. § 153, first (i). Thus, in our opinion this

phase of the dispute is a matter for the Adjustment Board and they are free to adopt a different approach. The parties may seek to support their particular interpretation by evidence as to usage, practice and custom and the Adjustment Board is peculiarly fitted and specifically designated to deal with such matters.[30]

This brings us to the body of doctrine developed under the Act in order to determine whether the Company's use of Carmen to perform incidental electrical work constitutes a "unilateral change in major conditions of employment," as contended by the Electricians.

### IV

The first reason given by the District Court for concluding that the Electricians were unlikely to succeed on the merits was

1. That the defendant's implementation of the "incidental work rule" contained in the Memorandum of Understanding of December 4, 1969, as implemented by Public Law 91–226, and the plaintiff's challenge thereto does not involve a change in an agreement, but instead involves a question of the interpretation and application of an existing agreement covering rates of pay, rules and working conditions.

This is tantamount to saying that this is a minor as contrasted with a major dispute and therefore one which is properly cognizable by the Adjustment Board. App. 74.

The Railway Labor Act, as amended in 1934, created two independent procedures for resolution of disputes between carriers and the labor organizations representing their employees. Under the procedure initiated by a section 6 notice, summarized in note 6, *supra*, negotiations proceed through the Mediation Board and if necessary an Emergency Board, and may ultimately result in economic self-help. The alternative procedure, under section 3, leads to a final and binding determination of the dispute by the Adjustment Board.

This difference in treatment under the two procedures is dramatic, so that much litigation has evolved out of the attempt to distinguish between the types of disputes which are to be handled under each procedure. The leading case on this point is Elgin, J. & E. Ry. v. Burley, 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945), where the Court distinguished the two procedures as follows:

The first relates to disputes over the formation of collective agreements or efforts to secure them. They arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy. They look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past.

The second class, however, contemplates the existence of a collective agreement already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one. The dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case . . . In either case the claim is to rights accrued, not merely to have new ones created for the future.

In general, the difference is between what are regarded traditionally as the *major* and the *minor* disputes of the railway labor world. . . . 325 U.S. at 723, 65 S.Ct. at 1290. (Emphasis added.)

The difference between major and minor disputes [31] is important not only for the differing statutory procedures for ultimate resolution, but also for the differing approaches to interim relief pending that ultimate resolution. The major disputes procedure is marked at every stage by provisions for mainte-

---

30. Order of Conductors v. Pitney, *supra* note 29, 326 U.S. at 567, 66 S.Ct. 322.

31. 48 Am.Jur.2d Labor and Labor Relations §§ 1485, 1486 (1970).

nance of the status quo pending ultimate agreement. Because of these provisions for preserving the status quo the federal courts may enjoin carriers from implementing changes until the statutory procedures have been exhausted.[32] Indeed, the Supreme Court has noted that

The Act's status quo requirement is central to its design. Its immediate effect is to prevent the union from striking and management from doing anything that would justify a strike. In the long run, delaying the time when the parties can resort to self-help provides time for tempers to cool, helps create an atmosphere in which rational bargaining can occur, and permits the forces of public opinion to be mobilized in favor of a settlement without a strike or lockout. Moreover, since disputes usually arise when one party wants to change the status quo without undue delay, the power which the Act gives the other party to preserve the status quo for a prolonged period will frequently make it worthwhile for the moving party to compromise with the interests of the other side and thus reach agreement without interruption to commerce.

Detroit & T. S. L. R. R. v. United Transp. Union, 396 U.S. 142, 150, 90 S.Ct. 294, 299, 24 L.Ed.2d 325 (1969). What makes these provisions so effective is the intentionally near-interminable procedures for resolving major disputes: "[T]he procedures of the Act are purposely long and drawn out, based on the hope that reason and practical considerations will provide in time an agreement that resolves the dispute." Brotherhood of Ry. & S. S. Clerks v. Florida East Coast Ry., 384 U.S. 238, 246, 86 S.Ct. 1420, 1424, 16 L.Ed.2d 501 (1966).

The so-called minor disputes, on the other hand, involving grievances, affect the smaller differences which inevitably appear in the carrying out of major agreements and policies or arise incidentally in the course of an employment. They represent specific maladjustments of a detailed or individual quality. They seldom produce strikes, though in exaggerated instances they may do so.

Elgin, J. & E. Ry. v. Burley, *supra,* 325 U.S. at 724, 65 S.Ct. at 1290. Accordingly, the procedures for settling minor disputes are much shorter and simpler, and there are no equivalent status quo provisions.

■ The Congress having vested jurisdiction to resolve railway labor disputes in specialized administrative bodies, *e. g.,* the Mediation and the Adjustment Boards, courts have been reluctant to intervene. Where judicial intervention has been necessary to protect fundamental interests under the Act, it has been authorized,[33] but the more common practice in minor disputes has been to deny judicial intervention through enforcement of equitable remedies in deference to the operation and decisions of the Adjustment Board.[34]

The availability of equitable relief to judicially forestall actions taken by either the carriers or the labor organizations thus will often depend on the characterization of the dispute between the parties as a major or minor one. Such is the case here, for if the District Court were to conclude on the merits that the Company's action constitutes a unilateral change in major conditions of employment—making the dispute a major one—the Electricians would be entitled to

32. *See, e. g.,* Detroit & T.S.L.R.R. v. United Transp. Union, 396 U.S. 142, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969); Illinois Cent. R.R. v. Brotherhood of Locomotive Eng'rs, 422 F.2d 593 (7th Cir. 1970); Southern Ry. v. Brotherhood of Locomotive Firemen, 119 U.S.App.D.C. 91, 337 F.2d 127 (1964).

33. The leading cases are Virginian Ry. v. System Fed'n No. 40, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789 (1937); and Texas & N.O.R.R. v. Brotherhood of Ry. Clerks, 281 U.S. 548, 50 S.Ct. 427, 74 L.Ed. 1034 (1930).

34. *See, e. g.,* Slocum v. Delaware, L. & W. R.R., *supra* note 29; Order of Conductors v. Pitney, *supra* note 29.

injunctive relief under the status quo provisions of the Act. If, however, the dispute is characterized as minor, then the injunction may properly be denied unless irreparable injury is shown separately.[35] This distinction between major and minor disputes and the District Court's conclusion that the present dispute is a minor one, is the legal premise which we are reviewing here under the principles enunciated in *Delaware & H. Ry.*[36]

█ The purpose and effect of Public Law 91–226 was to convert the December 4, 1969 Memorandum of Understanding between the negotiators into the equivalent of a contract agreement governed by the same principles as any other agreement reached under the procedures of the Railway Labor Act. Thus, while it may be said that the whole situation is the result of a statute and we are interpreting a statute, still Congress has directed that it be handled as an "agreement" and in our opinion this "statute" has the effect of conferring jurisdiction on the Adjustment Board when the interpretation of that "agreement" involves a minor dispute. So whether a statute or an agreement is involved the Adjustment Board has jurisdiction of a minor dispute therein. Accordingly, we must determine under the Supreme Court's *Elgin* standards whether the dispute over use of Carmen to perform incidental electrical work

> arise[s] where there is no . . . agreement or where it is sought to change the terms of one . . . [or whether] [t]he dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation . . .
> 325 U.S. at 723, 65 S.Ct. at 1290.

Predictably, the Electricians here contend that by extending the incidental

work rule imposed by Public Law 91–226 to the Carmen, who originally were not parties to that dispute, the Company was unilaterally changing the terms and conditions of employment prescribed in that "contract." Equally predictably, the Company contends that all that is at issue is the meaning or application of the phrases "mechanic or mechanics of a craft or crafts" and "covered by the classification of work rules of another craft or crafts" as those phrases are used in the "contract." In similar circumstances the Ninth Circuit stated:

> It is true, as the union points out, that a controversy, although couched in terms of a disagreement as to interpretation of a contract, may under some circumstances be regarded as a major dispute. This result may be reached if it can be said that the change being imposed by one side on the other *is in nowise contemplated or arguably covered by the agreement.* The provisions of the Railway Labor Act may not be avoided merely through the device of unilateral action which the actor purposefully intends shall not become a part of the agreement. The major-minor dispute dichotomy does not relate to artfully contrived formalistic demands or responses, but to matters of substance. . . .
> 
> But where the position of one or both of the parties *is expressly and arguably predicated on the terms* of the agreement, as illuminated by long-standing practices, the question of whether the position is well taken involves a minor dispute.

Switchmen's Union v. Southern Pac. Co., 398 F.2d 443, 447 (9th Cir. 1968) (emphasis added; citations omitted).

█ The proper judicial test of a minor dispute is thus a narrow one, for as Chief Judge Matthes of the Eighth Circuit has recently pointed out,[37] the

---

35. Order of Conductors v. Pitney, *supra* note 29, 326 U.S. at 567, 66 S.Ct. 322.

36. Delaware & H. Ry. v. United Transp. Union, 146 U.S.App.D.C. 142, 158–161, 450 F.2d 603, 619–622 (1971). *See* Part II of this opinion, *supra.*

37. It is clear, however, that the line between changes in working conditions which are or are not allowed by a contract is very thin and therefore any attempt by a court to make a definitive resolution of this question would tread

Act vested exclusive jurisdiction over resolution of such disputes in the Adjustment Board, and where the dispute is even arguably a minor one that administrative body should have the first opportunity to evaluate and decide it.

> [T]he test to be applied is that if the contract is reasonably susceptible to the interpretations sought by both the carrier and union, the dispute is minor and within exclusive adjustment jurisdiction. . . . *Only if* . . . *the contract were not reasonably susceptible to the carrier's contention would this be a § 6 dispute proper for a "status quo" injunction.*

United Transp. Union v. Burlington Northern, *supra* note 3, 458 F.2d at 357 (emphasis added; citations omitted).

■ Applying these tests to the present dispute we find ample support for the District Court's conclusion that this is a minor dispute suitable for resolution by the Adjustment Board. To begin, the contention of the Company is "expressly and arguably predicated on the terms of the agreement," *i. e.*, the Memorandum of Understanding. The Memorandum refers to "mechanics" and "crafts" without any words of limitation that would narrow these terms to the four parties to the negotiations who tentatively initialed the Memorandum. Furthermore, the "long-standing practice" was for all six of the shop craft unions to bargain together or at the very least to bargain for substantially identical contracts.[38] It is certainly arguable, then, that the rule authorizes performance of incidental work in any of the six shop "craft" unions here involved by any of the "mechanics" whose unions are bound by the incidental work rule either by contract or by Public Law 91–226. This encompasses both the Electricians and the Carmen and the work of their crafts.

We also believe that the possibility that mechanics in other crafts might be brought within the scope of the incidental work rule through subsequent agreements containing similar rules was clearly within the contemplation of the parties. When proposals were being considered in Congress for implementing the Memorandum of Understanding for the three ratifying unions and leaving the Sheet Metal Workers to some form of arbitration or continuing negotiation, the question was raised about implementation of the incidental work rule. Mr. Winpisinger, vice president of the Machinist's Union, expressed his view as follows:

> Mr. WINPISINGER. I don't think the fact should be ignored that there is a substantial interplay under this rule as between the three of the organizations who propose to sign the agreement. Incidental work does not affect only the Sheet Metal Workers. It affects all of our organizations. There would be an interplay as between the three of us if it were in effect at this point. Obviously, it is contemplated I think from the Sheet Metal Workers' proposal that they would not be bound by the rule, and therefore interplay [between the other three crafts and the Sheet Metal Workers] would be held at least in limbo until the arbitration came down and we found out whether or not they were party to the rule and whether they were bound by that rule.[39]

From this it is at least arguable, then, that once the four unions were bound by

---

upon the exclusive jurisdiction of the adjustment agencies.

United Transp. Union v. Burlington Northern, 458 F.2d 354, 357 (8th Cir. 1972).

38. Indeed, the basic agreement between the parties to this dispute, to which the contract in question is merely the periodic up-dating and revising of terms, was between the Washington Terminal Company and Railway Employees' Department System Federation No. 106 (composed of IBEW, IAM, IBBB, SMWI *and* the Carmen). App. 38. We have previously noted that shortly after Pub.L. 91–226 was enacted the Carmen signed a national agreement containing an incidental work rule identical to the one involved here.

39. Senate Hearing II, *supra* note 28, at 114.

the rule, interplay between them and a fifth might be accomplished by having that fifth union agree to the same identical rule. This conclusion is fortified by the language of the incidental work rule being in nowise restrictive as to "mechanics" or "craft."

There is additional testimony in the congressional hearings that demonstrates this was precisely what the carriers had intended to do and that the unions had advance notice of such intention. Mr. John W. O'Brien, General Vice President of the Sheet Metal Workers, and their principal spokesman in this dispute, testified before the congressional committee that it had been his understanding that the negotiations related solely to the locomotive departments of the railroads.[40] He contended that in the February 1970 bargaining sessions Mr. Hiltz (representing the carriers) revealed for the first time the railroads' intent to expand the rule [41]:

> During the week of February 8, about February 12, in response to a union offer, Mr. Hiltz told Assistant Secretary [of Labor] Usery that the rail bargainers and management would extend the incidental work rule proposed to cover all running repairs in all departments, including passenger, freight departments, et cetera.
>
> \* \* \* \* \* \*
>
> He said—Mr. Hiltz, I am talking about—"This is to apply to all running repairs."
>
> The question was asked, "What about Mr. George O'Brien's union, the carmen, they are not party to this."
>
> He said, "I intend to discuss this with Mr. O'Brien and have it apply to him, too"—I guess write the same rule.

Mr. Hiltz in subsequent testimony denied the element of surprise and explained the basis of the carriers' contention: [42]

This rule was written by the unions in the handwriting of one of the union negotiators. Mr. O'Brien was there when this rule was presented to us— and [as] subsequently accepted by management reads, and I will quote: "At running repair work locations which are not designated as outlying points where," et cetera, et cetera.

It does not say at running repair work locations where locomotives are repaired or where doodlebugs are repaired or anything else. It says at running repair work locations.

This language does not even suggest that this work is restricted to locomotive repairs inasmuch as running repairs are performed on all types of equipment on which these unions do work.

We, of course, need not resolve this question—that is the task solely of the Adjustment Board once we determine, as we have, that this exchange and our interpretation of Public Law 91–226 and the Agreement with the Carmen wholly prevents us from finding that the contention of the carriers here was "in nowise contemplated or arguably covered by the agreement." On the contrary, the agreement was "reasonably susceptible" of the carriers' approach.

One further factor enters into our analysis of whether the Company's position on this appeal was reasonably within the contemplation of the parties to this agreement. If there were a significant difference in either the skill- or pay-level of the carmen from the other four unions, a very plausible argument could be made that the original four would never accede to an agreement bringing the carmen within the scope of the rule. If the carmen were low-skill or low-pay employees, the carriers would have a strong incentive to replace the more expensive mechanics with carmen. In such a situation the low-pay union would be eager to sign the additional agreement

---

40. *Id.* at 44 (prepared remarks); Senate Hearings I, *supra* note 28 at 83.

41. House Hearings, *supra* note 28, at 119.

42. *Id.* at 232–33.

because they could envision more work for their membership; the other four, however, would be vehemently opposed to participation of the low-pay union within the scope of the rule because their jobs would be directly threatened. If all five unions received approximately the same wages, then the only incentive for the carriers to use one union's men to perform incidental work in another union's craft is to improve the overall efficiency of the shop. In this situation, there would be no strong economic incentive either for the Carmen to join the agreement or for the other four to oppose their participation.

One could argue that the Electricians' opposition to the Carmen in this case results from such economic factors and demonstrates that the interplay between the Carmen and the others was not within the contemplation of the other four when proposing the incidental work rule. We find evidence in the record here, however, to refute such a position. When the February 1970 negotiations were stalled by the adamant opposition of the Sheet Metal Workers, the other three unions, *including the appellant,* the Electricians offered to break the deadlock by replacing the Sheet Metal Workers with the Carmen in the Agreement. This demonstrated willingness to participate in an incidental work rule with the Carmen wholly undercuts the Electricians' present arguments—at least to the extent necessary for us to find that this is a minor dispute that should go to the Adjustment Board for ultimate resolution.

## V

We do not in any way intend to suggest an opinion as to whether or not the Company should be permitted to employ Carmen to perform incidental work in the other four unions' crafts. Our task, as was the District Court's is the much narrower one of determining whether the work rules implemented by Public Law 91–226 are reasonably susceptible to such an interpretation when coupled with identical rules agreed to by the Carmen. We agree with the Eighth Circuit's expression of the proper legal premise to apply here:

> Only if . . . the contract were not reasonably susceptible to the carrier's contention would this be a § 6 dispute proper for a "status quo" injunction.[43]

We believe the action of the District Court in denying the preliminary injunction requested by the Electricians conforms to that premise, and we therefore affirm that order.

Judgment accordingly.

43. United Transp. Union v. Burlington Northern, *supra* note 37, 458 F.2d at 357.

APPENDIX

CHRONOLOGY

| | |
|---|---|
| Nov. 8, 1968 | IBEW, IAM, IBBB, & SMWI served § 6 notices on virtually all railroads requesting wage changes and suggesting national handling if local settlements could not be reached. |
| Nov. 9, 1968 | Railroads, including Washington Terminal, served § 6 notices on IBEW, IAM, IBBB, & SMWI proposing .changes in work rules. |
| Mar. 17, 1969 | Failing local agreements, national bargaining commenced between Employees Conference Committee and National Railway Labor Conference. |
| Apr. 10, 1969 | Failing national agreement, parties jointly applied for services of National Mediation Board. |
| Aug. 19, 1969 | Mediation Board requested parties to submit dispute to voluntary arbitration; unions refused. |
| Sept. 3, 1969 | Mediation Board relinquished jurisdiction. |
| Sept. 3-Oct. 3, 1969 | Unions announce intention to strike 7 carriers; carriers announce intention to lock-out nationally if anyone struck. Mediation Board informs the President of its failure to resolve the dispute. |
| Oct. 3, 1969 | President convenes Emergency Board No. 176 to investigate the dispute. |
| Nov. 2, 1969 | Unions refuse recommendations of Emergency Board and Board reports to the President its failure to resolve dispute. Negotiations continue, however, under the auspices of the Department of Labor. |
| Dec. 4, 1969 | The Memorandum of Understanding initialed by all parties to the negotiation. |
| Dec. 17, 1969 | Results of ratification vote announced; membership of SMWI rejected the agreement. |
| Jan. 31, 1970 | Unions struck Union Pacific; carriers announced nationwide lockout; District Court for D.C. issued TRO against both actions. |
| Jan. 31-Mar. 2, 1970 | Negotiations continue under Department of Labor mediation and TRO voluntarily extended to Feb. 20 when argument scheduled on preliminary injunctions. Following argument TRO extended to Mar. 2. |
| Feb. 18, 1970 | IBEW, IAM, IBBB offer to sign agreement without SMWI, or, in the alternative, with Carmen replacing SMWI. Carriers reject both offers. |
| Mar. 2, 1970 | District Court enters injunction against selective strikes: IAM v. Nat'l Ry. Labor Conf., 310 F.Supp. 905 (D.D.C.1970), vacated & dis- |

missed as moot sub nom. Alton & S. Ry. v. IAM, 150 U.S.App.D.C. 36, 463 F.2d 872 (1972).

| | |
|---|---|
| Mar. 3, 1970 | Unions announce national strike for midnight Mar. 4. President requests emergency legislation from Congress placing into effect the Dec. 4 Memorandum as the agreement between the parties. |
| Mar. 4, 1970 | Hearings held in House and Senate on President's proposal. Pub.L. 91–203, 84 Stat. 22, enacted freezing the situation and preventing any strike or lockout prior to Apr. 11. |
| Mar. 4-Apr. 9, 1970 | Further negotiations held between the parties; further hearings held in House and Senate. |
| Apr. 9, 1970 | Pub.L. 91–226 enacted, placing the Dec. 4 Memorandum of Understanding into effect as the agreement between the parties. |
| Apr. 24, 1970 | Effective date of national agreement between the railroads and the Carmen's union. |
| May 1, 1970 | IBEW representative at Washington Terminal filed time claim for incidental electrical work performed by member of Carmen's union. |
| May 28, 1970 | Washington Terminal rejected time claim filed by IBEW. |
| May 29, 1970 | IBEW served letter on Washington Terminal claiming the assignment of incidental work to Carmen constituted a "major" dispute and IBEW would strike if the practice were not stopped. Company agreed to temporary cessation pending a meeting of national bargaining representatives scheduled for July 8. |
| June 26, 1970 | IBEW announced its intention to strike the Southern Pacific on June 29 on precisely the same issue. |
| June 29, 1970 | TRO issued against IBEW preventing strike against Southern Pacific. |
| July 8, 1970 | National meeting achieved no meaningful agreement. |
| July 9, 1970 | U. S. District Court for Eastern District of California issued preliminary injunction against IBEW strike on Southern Pacific, holding that the dispute was "minor" and conditioning injunction on Southern Pacific's submission thereof to the National Railroad Adjustment Board. |
| July 31, 1970 | IBEW filed counterclaim in Southern Pacific litigation that was virtually verbatim with the present litigation in instant case. |
| Aug. 7, 1970 | Washington Terminal informed local IBEW of the Southern Pacific litigation and announced its intention to resume assignments of incidental work to carmen. |

| Sept. 15, 1970 | IBEW filed instant suit. |
| Sept. 29, 1970 | District Court denied IBEW's motion for TRO in instant case. |
| Oct. 5, 1970 | The District Court in California denied IBEW's request for injunction from the bench, holding the dispute to be minor. |
| Oct. 6, 1970 | District Court here denied IBEW's request for preliminary injunction from the bench. |
| Oct. 19, 1970 | District Court in instant case filed written findings of fact, conclusions of law and order. |