888 F.2d 1428
 132 L.R.R.M. (BNA) 2913, 281 U.S.App.D.C.
231, 58 USLW 2310,
113 Lab.Cas. P 11,647
 LOCAL 808, BUILDING MAINTENANCE, SERVICE AND RAILROAD
WORKERS and International Brotherhood of
Teamsters, Chauffeurs, Warehousemen and
Helpers of America, Appellees,
v.
NATIONAL MEDIATION BOARD and Metro-North Commuter Railroad
Company, Appellants.
 Nos. 89-5153, 89-5154.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Sept. 8, 1989.
Decided Nov. 3, 1989.
As Amended Feb. 23, 1990.
 
 Marc Richman, Atty., Dept. of Justice, with whom Jay B. Stephens, U.S. Atty., Stuart E. Schiffer, Acting Asst. Atty. Gen., and William Kanter, Atty., Dept. of Justice, Washington, D.C., Ronald M. Etters, Gen. Counsel, Nat. Mediation Bd. were on the brief, for appellant Nat. Mediation Bd.
 Arnold B. Podgorsky, Washington, D.C., with whom Robert Bergen and Walter E. Zullig, Jr., New York City, were on the brief, for appellant Metro-North Commuter R.R. Co.
 Roland P. Wilder, Jr., Washington, D.C., with whom Christy Concanon was on the brief, for appellees.
 Before MIKVA, EDWARDS and WILLIAMS, Circuit Judges.
 Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.
 Dissenting opinion filed by Circuit Judge MIKVA.
 HARRY T. EDWARDS, Circuit Judge:
 
 
 1
 This appeal challenges an unprecedented judgment of the District Court ordering the National Mediation Board ("NMB" or "Board") to terminate mediation and proffer arbitration in connection with a "major dispute" between Local 808, Building Maintenance, Service and Railroad Workers ("Union" or "Local 808") and Metro-North Commuter Railroad ("Metro-North" or "Railroad"). Appellants NMB and Metro-North claim that the trial court had no authority to review the Board's determination that its efforts to mediate the parties' dispute have not proved unsuccessful, and that, therefore, the Board is not required by section 5 First of the Railway Labor Act ("Act" or "RLA"), as amended, 45 U.S.C. Sec. 155 First (1982), to terminate mediation and proffer arbitration. The appellants also point out that there never has been a final disposition of a case in which a court has required the NMB to discontinue mediation and proffer arbitration.
 
 
 2
 In a situation such as the one before us, a court has jurisdiction to provide a remedy only "if the Board continues mediation on a basis that is completely and patently arbitrary and for a period of time that is completely and patently unreasonable, notwithstanding the lack of any genuine hope or expectation that the parties will arrive at an agreement." International Ass'n of Machinists & Aerospace Workers v. NMB, 425 F.2d 527, 537 (D.C.Cir.1970) ("Machinists ") (Leventhal, J.). This rule has come to mean that court relief from continuation of mediation "will be available, if at all, only in a most extraordinary situation bordering on patent official bad faith." See Delaware & Hudson Ry. v. United Transp. Union, 450 F.2d 603, 608 & n. 11 (D.C.Cir.) (Leventhal, J.), cert. denied, 403 U.S. 911, 91 S.Ct. 2209, 29 L.Ed.2d 689 (1971). Because we find that the Board, in deciding to continue mediation, did not act in patent official bad faith, we hold that the District Court was without authority to review the Board's determination. Accordingly, we reverse and remand to the District Court for dismissal with prejudice.
 
 I. BACKGROUND
 A. Factual History
 
 3
 In July 1985, Local 808, the collective bargaining representative for Metro-North's track workers, served a notice on Metro-North proposing changes in the pay, rules and working conditions of Metro-North's track workers.[1] Local 808's proposal sought parity with the Long Island Rail Road ("LIRR") track workers and included, inter alia, a demand for a wage increase of twenty percent per year for three years, additional paid holidays and a pension plan equal to that offered by the LIRR. Metro-North, thereafter, served its own section 6 notice on Local 808 offering a two percent wage increase per year in exchange for substantial work rule relief and health and welfare cost containment. Local 808 then informed Metro-North that it would negotiate as a member of a coalition of sixteen bargaining representatives.
 
 
 4
 The Union and Metro-North met nine times for bargaining during the ensuing ten months. In June of 1986, Local 808, notwithstanding its representation that it would bargain with the coalition on common issues, requested NMB's mediation services. Between October 1986 and February 1988, Local 808 and Metro-North attended fourteen NMB mediated sessions. Representatives of the parties also met privately with the mediator or a member of the NMB many times. In February 1988, Local 808 asked the mediator for the Railroad's last best offer, which failed union membership ratification by a 411-12 vote. Shortly thereafter, Metro-North served the Union with a new contract proposal that offered terms less favorable to the Union than the proposal rejected by the employees.
 
 
 5
 On April 18, 1988, the Union formally requested the NMB to end mediation and to proffer arbitration. The Union declared: "the parties have reached the point where it is apparent that continued mediation will not result in a settlement. It is time to begin the procedures prescribed in Sec. 9A of the Act; perhaps Emergency Board proceedings will lead to settlement." Complaint 24, reprinted in Joint Appendix ("J.A.") 15. The NMB declined to proffer arbitration on the ground that continuing mediation would enhance the prospects for ultimate settlement. Two months later, on June 24, 1988, the Union filed its complaint in district court. As of the date the complaint was filed, the dispute had been on the Board's mediation docket for about two years.B. Procedural History
 
 
 6
 The District Court granted Metro-North's motion to intervene, and, on May 19, 1989, the trial judge issued an order directing the NMB to cease mediation and to proffer arbitration within twenty days. See Local 808 v. NMB, Civ. Action No. 88-1730 (D.D.C. May 19, 1989), reprinted in J.A. 430-31. The District Court held that the Board violated its duty under section 5 First of the Railway Labor Act (codified as amended at 45 U.S.C. Sec. 155 First (1982)) when it failed to proffer arbitration after mediation efforts proved unsuccessful. See Local 808 v. NMB, slip op. at 19-21, reprinted in J.A. 427-29.
 
 
 7
 On June 9, 1989, consistent with the District Court's order, the NMB proffered arbitration. Metro-North accepted arbitration. Local 808 rejected arbitration. Metro-North then requested the President to create an Emergency Board, pursuant to section 9A of the Act, 45 U.S.C. Sec. 159a(c)(1) (1982). On July 13, 1989, appellants NMB and Metro-North filed a renewed motion for a stay pending appeal of the District Court's May 19, 1989 order. This court granted the stay on July 25, 1989. See Building Maintenance, Serv. & R.R. Workers, Local 808 v. NMB, Civ. Action No. 88-01730 (D.C.Cir. July 25, 1989) (Order).
 
 II. ANALYSIS
 A. Statutory Framework
 
 8
 The Railway Labor Act of 1926, Pub.L. No. 257, 44 Stat. 577 (1926) (codified as amended at 45 U.S.C. Sec. 151 et seq. (1982)), which was drafted in an unusual collaborative effort by a committee representing railroads and railroad unions,[2] was devised to provide a workable solution for resolving disputes in their industry with minimal disruption to the public. See 45 U.S.C. Sec. 151a (1982); H.R.Rep. No. 1944, 73d Cong., 2d Sess. 1-2 (1934); Chicago & N.W. Ry. v. United Transp. Union, 402 U.S. 570, 589, 91 S.Ct. 1731, 1741, 29 L.Ed.2d 187 (1971) (Brennan, J. dissenting); Detroit & T. Shore Line R.R. v. United Transp. Union, 396 U.S. 142, 148-49, 90 S.Ct. 294, 298-99, 24 L.Ed.2d 325 (1969). "The major purpose of Congress in passing the Railway Labor Act was to 'provide the machinery to prevent strikes' and the resulting interruptions of interstate commerce." Machinists, 425 F.2d at 533. To achieve this goal, the Act establishes an elaborate mediation and conciliation process, throughout which both parties are required to maintain the status quo. See 45 U.S.C. Secs. 152 Seventh, 155 First, 156, 159a(h), 160 (1982); Shore Line, 396 U.S. at 150-53, 90 S.Ct. at 299-301.
 
 
 9
 A principal aim of the RLA is to establish a detailed framework to facilitate settlement of "major disputes"[3] between carriers and their employees. As a general matter the statute requires the parties "to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes ... in order to avoid any interruption to commerce." 45 U.S.C. Sec. 152 First (1982); see also Consolidated Rail Corp. v. Railway Labor Executives' Ass'n, --- U.S. ----, 109 S.Ct. 2477, 2484, 105 L.Ed.2d 250 (1989) (indicating these as "core duties imposed upon employers and employees by the RLA"). More specifically, "[a] party desiring to effect a change of rates of pay, rules, or working conditions must give advance written notice." Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co., 394 U.S. 369, 378, 89 S.Ct. 1109, 1115, 22 L.Ed.2d 344 (1969); see 45 U.S.C. Sec. 156 (1982). If a dispute arises, "[t]he parties must confer, [45 U.S.C. Sec. 152 Second (1982) ], and if conference fails to resolve the dispute, either or both may invoke the services of the National Mediation Board...." Trainmen, 394 U.S. at 378, 89 S.Ct. at 1115; see 45 U.S.C. Sec. 155 First (1982).[4] "If mediation fails, the Board must endeavor to induce the parties to submit the controversy to binding arbitration, which can take place, however, only if both consent." Trainmen, 394 U.S. at 378, 89 S.Ct. at 1115; see 45 U.S.C. Secs. 155 First, 157 First (1982).
 
 
 10
 Most importantly, while the dispute is working its way through these stages--conference, mediation and the waiting period of thirty days after a party refuses the Board's proffer of arbitration--neither party may unilaterally alter the status quo. See 45 U.S.C. Secs. 152 Seventh, 155 First, 156 (1982); Trainmen, 394 U.S. at 378, 89 S.Ct. at 1115. Thus, it is only after the Board has proffered arbitration and a party has waited the requisite thirty day cooling-off period (or sixty days in the event an Emergency Board has been created by the President),[5] that a party may engage in self-help. For this reason, the Board's power to hold a dispute in mediation is the key to the structure Congress established for bringing about settlements without industrial strife.
 
 
 11
 Congress, in a 1981 amendment to the RLA, provided additional procedures beyond mediation for disputes involving publicly funded and operated interstate commuter railroads. See Omnibus Budget Reconciliation Act of 1981, Pub.L. No. 97-35, tit. XI, Sec. 1157, 95 Stat. 357, 681-82 (1981) (codified at 45 U.S.C. Sec. 159a (1982)) ("section 9A"). Under section 9A of the Act as amended, either party may act to require the President to create, consecutively, two emergency boards to investigate and report on the dispute. Cooling-off periods, during which the parties must maintain the status quo, also attend the section 9A procedures, further delaying recourse to self-help by as much as eight months.[6] Metro-North is engaged in the interstate transportation of commuters in Connecticut and New York and, thus, the additional procedures established by section 9A apply to the dispute in this case.
 
 
 12
 It is within the context of this elaborate statutory framework, which requires prolonged maintenance of the status quo, that Local 808 seeks to have the court dislodge the key to the conciliatory process by ordering the NMB to cease mediation. According to Local 808, the Board violated section 5 of the RLA[7] by refusing to proffer arbitration after mediation proved unsuccessful. See Brief for Appellees at 21-22.
 
 B. Judicial Review of NMB Decisions
 
 13
 In no case cited by the parties to this case, and in none that we can find, has a court ever ordered the National Mediation Board to terminate mediation and proffer arbitration. There are, however, several cases in which courts have refused to order the NMB to proffer arbitration. See, e.g., Machinists, 425 F.2d 527 (D.C.Cir.1970) (dismissing the claim with prejudice); International Ass'n of Machinists & Aerospace Workers v. NMB, 725 F.Supp. 558 (D.D.C. 1989) (refusing to order the Board to proffer arbitration after a three year mutually agreeable hiatus in mediation, which followed three years of mediation that produced no settlement); Seaboard World Airways v. Local 851, Int'l Bhd. of Teamsters, 501 F.Supp. 47 (E.D.N.Y.1980) (dismissing the claim with prejudice). The reason the Union is unable to cite any support for its position is that the courts have only an "extraordinarily limited" authority to review decisions of the Board. See, e.g., Professional Cabin Crew Ass'n v. NMB, 872 F.2d 456, 459 (D.C.Cir.1989) (finding no jurisdiction to review NMB's dismissal of an application for certification as bargaining representative).[8] This court has recently observed, also in the context of a representation suit, that "[j]udicial review of NMB decisions is one of the narrowest known to the law." International Ass'n of Machinists & Aerospace Workers v. Trans World Airlines, 839 F.2d 809, 811 (D.C.Cir.1988), amended, 848 F.2d 232 (D.C.Cir.1988), cert. denied, --- U.S. ----, 109 S.Ct. 62, 102 L.Ed.2d 40 (1988). See also Machinists, 425 F.2d at 543 (the courts have no authority to require the NMB to terminate mediation except in an "extraordinary and exceptional situation"). As the Ninth Circuit has noted, "[t]he question whether federal courts have jurisdiction to review Board decisions is not the same as the question whether federal courts have jurisdiction to enforce provisions of the Act." Air Line Pilots Ass'n, Int'l v. Transamerica Airlines, 817 F.2d 510, 513 (9th Cir.), cert. denied, 484 U.S. 963, 108 S.Ct. 451, 98 L.Ed.2d 391 (1987).
 
 
 14
 Furthermore, the Supreme Court has made it clear that the courts have no business interfering in major disputes under the RLA.
 
 
 15
 The RLA provides an exhaustively detailed procedural framework "to facilitate the voluntary settlement of major disputes." The effectiveness of these private dispute resolution procedures depends on the initial assurance that the employees' putative representative is not subject to control by the employer and on the subsequent assurance that neither party will be able to enlist the courts to further its own partisan ends.
 
 
 16
 Trans World Airlines v. Independent Federation of Flight Attendants, --- U.S. ----, 109 S.Ct. 1225, 1234, 103 L.Ed.2d 456 (1989) (citations omitted) (emphasis added). The Supreme Court similarly concluded in Burlington Northern Railroad Co. v. Brotherhood of Maintenance of Way Employees that "[e]ven when a violation of a specific mandate of the RLA is shown, 'courts should hesitate to fix upon the injunctive remedy ... unless that remedy alone can effectively guard the plaintiff's right.' " 481 U.S. 429, 446, 107 S.Ct. 1841, 1851, 95 L.Ed.2d 381 (1987) (quoting International Ass'n of Machinists v. Street, 367 U.S. 740, 773, 81 S.Ct. 1784, 1802, 6 L.Ed.2d 1141 (1961)).
 
 
 17
 In a situation of the sort that we face in this case, where the union seeks an injunction compelling the NMB to proffer arbitration and cease mediation, this court in Machinists held that the NMB is entitled to as strong a presumption as the legislature that "if any state of facts might be supposed that would support its action, these facts must be presumed to exist." 425 F.2d at 540. In short, a court has no jurisdiction to review the NMB's decision if
 
 
 18
 there is a reasonable possibility of conditions and circumstances (including attitudes and developments), available to the Board, consistent with the objective facts, sufficient to justify the Board's judgment that the possibility of settlement is strong enough to warrant continuation of the mediation process. However skeptical of success the court may be it cannot obliterate even the slim chance of success that may ensue from exhaustion of the process entrusted by Congress to the Mediation Board.
 
 
 19
 Id., at 541.
 
 
 20
 Clearly Congress contemplated a narrow role for the courts. The legislative history shows that "our thought has been in this law not to write a lot of statute law for the courts to enforce.... [I]n the main the purpose of this bill is not to write some new law for the courts to enforce. We expect that most of the provisions of this bill are to be enforced by the power of persuasion, either exercised by the parties themselves or by the Government board of mediation representing the public interest." Railroad Labor Disputes: Hearings on H.R. 7180 Before the House Comm. on Interstate and Foreign Commerce, 69th Cong., 1st Sess. 65-66 (1926) (testimony of Donald R. Richberg, major spokesperson for the unions); see also Chicago & N.W. Ry. v. United Transp. Union, 402 U.S. 570, 590-91, 91 S.Ct. 1731, 1742, 29 L.Ed.2d 187 (1971) (Brennan, J. dissenting) (quoting same testimony).
 
 
 21
 Absent a showing of patent official bad faith, a court has no authority to review the Board's decision to keep a dispute in mediation. In Machinists, 425 F.2d 527 (D.C.Cir.1970) (Leventhal, J.), the lead case addressing the judiciary's power to order the NMB to proffer arbitration, this court determined that courts have no authority to move a dispute out of mediation except in an "extraordinary and exceptional situation" in which "the Board continues mediation on a basis that is completely and patently arbitrary and for a period that is completely and patently unreasonable, notwithstanding the lack of any genuine hope or expectation that the parties will arrive at an agreement." Id. at 537, 543 (emphasis added). The Machinists court, looking to the Supreme Court's findings in Switchmen's Union and considering the kind of agency action involved in a decision to continue mediation, cautioned that the "kind of judicial scrutiny that may be provided by the courts" must be defined and confined so as "to avoid imperiling the heart of the legislative program" and so that the court "does not abort or trammel the administrative process." Id. at 536, 538.
 
 
 22
 Following Machinists, this court determined that the role of the Board is "so sensitive and critical that ordinary doctrines permitting judicial action on a complaint of arbitrary delay and protraction are so drastically restricted that court relief from continuation of the process will be available, if at all, only in a most extraordinary situation bordering on patent official bad faith." Delaware & Hudson Ry. v. United Transp. Union, 450 F.2d 603, 608 (D.C.Cir.1971) (Leventhal, J.) (emphasis added).[9] The unique role of mediators requires such a deferential judicial posture, as the Supreme Court has recognized. See, e.g., General Comm. of Adjustment v. Missouri-Kan.-Tex. R.R., 320 U.S. at 337, 64 S.Ct. at 152 ("The concept of mediation is the antithesis of justiciability"); Switchmen's Union v. NMB, 320 U.S. at 303, 64 S.Ct. at 98 ("Where Congress took such great pains to protect the Mediation Board in its handling of an explosive problem, [representation,] we cannot help but believe that if Congress had desired to implicate the federal judiciary and to place on the federal courts the burden of having the final say on any aspect of the problem, it would have made its desire plain.").
 
 
 23
 C. The Concept of Mediation is the Antithesis of Justiciability
 
 
 24
 The courts consistently have recognized that there is no feasible way for the judiciary to assess the basis for a mediator's decision to hold a dispute in mediation, except against a standard of patent official bad faith, the standard articulated in Delaware & Hudson. See 450 F.2d at 608. A court may not make inquiries about the mediator's understanding of the parties' positions, about the Board's reasons for its actions, or about the basis for the Board's belief that efforts to mediate might still be successful.[10] The court may seek from the Board information only as to the objective facts of the dispute and mediation. See Machinists, 425 F.2d at 539-40.[11]
 
 
 25
 The reason for this "black box" preserve relates to the special role of the mediator and the unusual dynamics of the mediation process. A mediator is "a go-between, a confidant of both parties." P. PRASOW & E. PETERS, ARBITRATION AND COLLECTIVE BARGAINING 234 (1970).
 
 
 26
 [I]nquiry by courts as to the reasoning process of the Mediation Board in regard to maintenance of mediation is destructive of the mediation process in general.... * Any candid response to inquiry as to reasons, whether put by party or court, might well require a revelation that, once made, would change the position and status of the Board irretrievably, and in a way that violates the legislative intent.
 
 
 27
 Machinists, 425 F.2d at 540.
 
 
 28
 A court will, thus, always be greatly restricted in its understanding of the dispute's progress in mediation. The Board will always know things about the parties and their dispute that the court does not know and can never know.
 
 
 29
 There are many, many cases where the mediators had locked in their breasts secrets that they could not possibly divulge to the other side, when they knew how far one party would go and how far the other party would go, and were trying to get them together, until finally they had gotten them to the line where they could say, "You have agreed to this, and the other fellows have agreed to this. Now, sign," and they could not possibly at any time let either party know how close they were together.
 
 
 30
 Railroad Labor Disputes: Hearings on H.R. 7180 Before the House Comm. on Interstate and Foreign Commerce, 69th Cong., 1st Sess. 88 (1926) (testimony of Donald R. Richberg, principal spokesperson for the unions). Thus, absent a showing of patent official bad faith, the court will have no means of determining that the basis for the Board's decision to keep a dispute in mediation was "completely and patently arbitrary" or that the period a dispute was kept in mediation is "completely and patently unreasonable." Machinists, 425 F.2d at 537.
 
 
 31
 Moreover, judges are in no position to second-guess the actions of mediators. Much of the work of a mediator is not amenable to judicial oversight because it does not culminate in what judges normally recognize as an appealable order. Mediation is an art-form used to avoid or break an impasse in a negotiation. It relies heavily on personal powers of persuasion, not adjudication. As one prominent mediator once noted, it is critically important that a mediator be left alone to find the means to bring the parties' divergent viewpoints closer together:
 
 
 32
 The degree of [a mediator's] involvement and the options he elects to pursue depend on the developing circumstances of each case. His role at one stage may be essentially passive--doing little more than chairing the meeting, keeping the negotiations rolling and controlling tempers. He may simply pass along proposals and counter proposals. The mediator may decide to separate the parties for a variety of reasons. It is in the separate caucuses that the most meaningful progress and groundwork for progress is usually made. It is where confidential and privileged information may be communicated to the mediator, ideas explored without commitment, previous positions re-examined without embarrassment. It provides an opportunity to both "sell" and "unsell" as well as to get each party to adopt a solution as its own. At any point during this process, the mediator may drop an idea, suggest a procedure, make a substantive suggestion, informally or formally, and at the outer range of his options, make an informal or even formal recommendation to the parties, orally or in writing. Formal recommendations are infrequently made and only when the mediator believes that such recommendations will close the remaining gap and be accepted by both parties. The right of a mediator to refuse to make recommendations is as critical as his right to make them. The choice must be that of the mediator alone. Diminishing his choice by either requiring recommendations or precluding them would adversely affect the mediation process as well as the bargaining process.
 
 
 33
 Willoughby Abner, Dispute Mediation in the Federal Government, Address at the 1968 Biennial Convention of the National Federation of Federal Employees, St. Louis, Mo. (Sept. 11, 1968), reprinted in D. ROTHSCHILD, L. MERRIFIELD & H. EDWARDS, COLLECTIVE BARGAINING AND LABOR ARBITRATION 186-87 (2d ed. 1979).
 
 
 34
 Not only must a mediator be "left alone" to find the means to resolve a dispute, it is equally important to recognize that "no two mediators operate in the same way." L. REYNOLDS, LABOR ECONOMICS AND LABOR RELATIONS 486 (6th ed. 1974). What works for one mediator may not work for another simply because their personalities are different. Therefore, it is extremely difficult for a court to find objective factors by which to measure a mediator's actions in any given negotiation. This is a further reason for a court to avoid disturbing the mediation process except in a truly extraordinary situation.
 
 
 35
 A mediator's choice to let a recalcitrant party sit until the pressure seriously to negotiate builds is hardly an extraordinary situation justifying judicial intervention. Rather, such a tactic is an essential tool of the process and profession, and it should not be disturbed by a court absent a clear showing of patent official bad faith. Congress, by creating a mediation board to resolve railroad labor disputes, bestowed upon the Board members the power to employ the legitimate, and greatly varied, tactics of the profession.[12] Courts have neither the access to information nor the special knowledge and experience to evaluate the likelihood of success of continued mediation. By contrast, mediation bodies have "developed a cadre of experts skilled in exposing the areas of basic disagreement and in discovering opportunities for agreement. These experts know how best to encourage the parties to display that additional bit of flexibility which fits demands and concessions together into an acceptable agreement." N. CHAMBERLAIN & J. KUHN, COLLECTIVE BARGAINING 413 (2d ed. 1965). Congress wisely left the decision of when mediation has proved unsuccessful to the Board. While it is clear that the Board does not have absolute immunity from judicial scrutiny, see, e.g., Machinists, 425 F.2d at 542-43 (determining that in the "rare and unusual case ... notwithstanding the vigorous presumption of validity, the court has jurisdiction to require termination of the mediation process"), it is equally clear that the court's authority is narrowly circumscribed to situations in which there has been a showing of patent official bad faith.
 
 D. The NMB's Conduct in This Case
 
 36
 It is against this standard of review, which apprehends both Congress' intent and the special nature of the mediation process, that this court must consider Local 808's request for an order compelling the Board to proffer arbitration. The District Court identified four factors leading to its conclusion that the Board's decision in this case warranted judicial action: (1) the mediation of the dispute had been "unusually long" for section 9A cases; (2) the mediation was "one-sided" because Metro-North had no "incentive to settle"; (3) a Board member expressed "disfavor" toward the section 9A procedures, declaring that the dispute would be held in mediation "indefinitely" and commenting that " 'the Union [did] not have a right' to 9A procedures;" and (4) the absence of recent mediation sessions and lack of agreement on any of the issues which led the court to conclude that "absolutely nothing appears to be occurring in this case while in theory it is in mediation." Local 808 v. NMB, Civ. Action No. 88-1730, slip op. at 11-17 (D.D.C. May 19, 1989), reprinted in J.A. 419-25. The Union asserts that "[h]ere, the undisputed objective facts ... plainly demonstrate that mediation was unsuccessful in this case." Brief for Appellees at 22. We disagree. Rather, we find that the facts of this case do not even come close to making a showing of official bad faith.
 
 1. Time in Mediation
 
 37
 The District Court concluded that the instant dispute had "been in mediation for an unusually long period of time." Local 808 v. NMB, slip op. at 11, reprinted in J.A. 419. We find that the time in mediation was not unusual and that it does not even approach a period that is "completely and patently unreasonable" so as to indicate bad faith.
 
 
 38
 The power to hold the parties in mediation or, at any time, to proffer arbitration, is a coercive tool essential to bringing the parties to conciliation. The Act specifies no time limit on mediation, and the Supreme Court has repeatedly recognized that the RLA's mediation procedures are purposely long and drawn out. See, e.g., Detroit & Shore Line R.R. v. United Transp. Union, 396 U.S. 142, 149, 90 S.Ct. 294, 299, 24 L.Ed.2d 325 (1969) (determining that a "crucial aspect of the Act was the power given to the parties and to representatives of the public to make the exhaustion of the Act's remedies an almost interminable process"); Consolidated Rail Corp. v. Railway Labor Executives' Ass'n, --- U.S. ----, 109 S.Ct. 2477, 2484, 105 L.Ed.2d 250 (1989) (noting the " 'virtually endless' process of negotiation and mediation established by the RLA for major disputes"); Burlington N. R.R. v. Brotherhood of Maintenance of Way Employees, 481 U.S. 429, 444, 107 S.Ct. 1841, 1850, 95 L.Ed.2d 381 (1987) (noting that the RLA "subjects all railway disputes to virtually endless" procedures); Brotherhood of Ry. & S.S. Clerks v. Florida East Coast Ry., 384 U.S. 238, 246, 86 S.Ct. 1420, 1424, 16 L.Ed.2d 501 (1966) ("procedures of the Act are purposely long and drawn out, based on the hope that reason and practical considerations will provide in time an agreement that resolves the dispute"); International Bhd. of Elec. Workers v. Washington Terminal Co., 473 F.2d 1156, 1171 (D.C.Cir.1972) ("What makes these provisions so effective is the intentionally near-interminable procedures for resolving major disputes...."), cert. denied, 411 U.S. 906, 93 S.Ct. 1530, 36 L.Ed.2d 195 (1973); Machinists, 425 F.2d at 534 (quoting "almost interminable process" language in Shore Line ).
 
 
 39
 The question of when to proffer arbitration is delicate, as the NMB's Executive Director explained:
 
 
 40
 In this case, as in all NMB mediation cases, there is never an identifiable best or absolute time to release the parties by issuing a proffer. The release date always is a matter of careful judgment and consideration based on both the public and confidential positions of the parties. For instance, the parties frequently may indicate for strategy purposes that their opponent's positions are completely unacceptable and they have no further offers to make while they confidentially have disclosed to the NMB's mediator that their position is more flexible. However, there does come a time in virtually every unsettled case where the NMB concludes that the agency's efforts to bring about an amicable settlement through mediation have been unsuccessful and a proffer is issued. The unpredictability of that final eventuality by the parties is an essential element of the special RLA mediation process.
 
 
 41
 Barnes Declaration p 11, reprinted in J.A. 340. The proper time for a dispute to remain in mediation is not susceptible of any objective or statistical estimation by the court.
 
 
 42
 Nevertheless, a few points are clear. First, in evaluating whether there has been patent official bad faith by virtue of the time a dispute has been in mediation, a court may not consider the time after a complaint has been filed. See Machinists, 425 F.2d at 542 ("Litigation time does not count as mediation time."). Thus, the District Court erroneously included the time after the complaint was filed in considering the time the dispute had been in mediation. The trial court stated that the dispute had been in mediation "for well over one thousand days," Local 808 v. NMB, slip op. at 11, reprinted in J.A. 419, nearly three years. The time in mediation properly considered, however, was approximately two years. Thus, the District Court's determination that the dispute had been in mediation an "unusually long period of time," see id., was based on an incorrect assessment.
 
 
 43
 The District Court similarly improperly considered the time after the complaint was filed when it concluded that no joint mediation sessions had been held for fifteen months. See id. at 15, reprinted in J.A. 423. The District Court's conclusion that "absolutely nothing appears to be occurring in this case while in theory it is in mediation," id. at 14, reprinted in J.A. 422, is based on the court's finding that the parties to the dispute had not met privately since June 1986 and that there had been no joint mediation sessions for fifteen months. See id. at 14-15, reprinted in J.A. 422-23. If the 11 months between the filing of the complaint and the date of the decision are ignored, as they must be, the period of purported mediation inactivity was at most four months. This is not an unusual period of time for Board inactivity. Moreover, the NMB's Executive Director observed that of 359 mediation cases docketed as of the date Local 808 filed its complaint, sixty-five percent have included a period of more than 120 days in which no joint mediation sessions were held. See Barnes Declaration p 7, reprinted in J.A. 339. Furthermore, not only is a four-month period of Board inactivity on a dispute not unusual--if indeed the Board was inactive[13]--even an atypical period of inactivity would provide no indication of bad faith where the context of the dispute indicates that such mediation tactics might be employed to inspire serious negotiation efforts.
 
 
 44
 The reason behind the rule discounting "litigation time" is that mediation conducted after filing of the complaint, "under the shadow of litigation overhanging the Mediation Board is not the kind of mediation envisaged by Congress ... [and] [i]ts failure or inconclusiveness does not demonstrate similar lack of success for a mediation process conducted without the artificial pressure and distortion of an overhanging litigation." Machinists, 425 F.2d at 542. Exclusion of the period after complaint also provides a deterrent to a party who might run to the court just to speed a delay. See id. Resort to the courts must never buttress the plaintiff's claim, although it may prolong the delay if the court finds no invalidity in the mediation process.
 
 
 45
 Second, contrary to the Union's contention, see Brief for Appellees at 23-26, and to the District Court's action, see Local 808 v. NMB, slip op. at 11-12, reprinted in J.A. 419-20, in considering whether the time a case has been in mediation evinces patent official bad faith, a court must compare the time in mediation with the time in mediation in all other RLA disputes, not just with mediation times in other publicly-funded commuter carrier disputes. There is nothing in the Railway Labor Act to suggest that disputes to which section 9A applies should be held in mediation for a shorter time period than disputes to which section 9A does not apply. Section 9A, added in 1981, establishes special additional procedures for creating emergency boards--after the negotiation, mediation and arbitration procedures applicable to all carrier-employee disputes have been exhausted--in disputes between publicly-funded and -operated carriers providing rail commuter service and their employees. See 45 U.S.C. Sec. 159a (1982). Section 9A comes into play only "[i]f a dispute between the parties ... is not adjusted under the foregoing provisions of this chapter," 45 U.S.C. Sec. 159a(b) (1982). The "foregoing provisions" clearly include section 5, 45 U.S.C. Sec. 155 First (1982), which gives the Board the power to determine when mediation is unsuccessful. In other words, section 9A supplements the processes described in the Act; it does not supplant or truncate them.
 
 
 46
 The language and structure of section 9A make it clear that Congress intended section 9A procedures to delay, not hasten, the time when parties could engage in self-help. Cf. Metro-North Commuter R.R. v. Local 808, Int'l Bhd. of Teamsters, No. 88 Civ. 6257, 1988 WL 103359 at 17 (S.D.N.Y. Sept. 27, 1988) (Walker, J.) (finding that Local 808's strike and refusal to work overtime--during the on-going dispute at issue in this case--was "causing and will continue to cause irreparable injury to Metro-North, its employees, and the public" and, if allowed to continue, "will interfere with and interrupt Metro-North operations, which are a vital part of the national and local passenger transportation systems"). We find it unnecessary to create a new, and more stringent, test for judicial review of section 9A cases. The test of Machinists and Delaware & Hudson apply here as in any case under the RLA. The main point of the discussion here is to show that the Union's arguments for a looser standard of review are utterly specious.
 
 
 47
 The time during which disputes between employees and commuter rail companies are in mediation must be compared with all other carrier disputes mediated before the Board. In this case, the Board has offered evidence that the time in mediation falls within the range of average times in other mediation cases. See Local 808 v. NMB, slip op. at 11-12, reprinted in J.A. 419-20; Barnes Declaration p 5, reprinted in J.A. 338. As of the date Local 808 filed its complaint, forty-three percent of the active mediations on the NMB's docket--155 of the Board's 359 cases--had been in process longer than the twenty-four months in this dispute between Metro-North and Local 808. See Barnes Declaration p 5, reprinted in J.A. 338. We reiterate that even if the period in mediation did exceed the norm, this does not mean that there has been patent official bad faith on the part of the Board.
 
 
 48
 In considering whether the Board's decision to hold a case in mediation evinces patent official bad faith, the Board's conduct must be considered in the broader context of the dispute. This broader context may provide one of many possible bases for the Board's decision to hold a case in mediation. Here, Metro-North was concurrently involved in negotiations and mediations with other unions on similar issues. Metro-North reached agreement with the eighteen other bargaining representatives with whom it had contract disputes--many of these parties, like Local 808, initially demanded parity with LIRR workers.[14] The NMB participated in negotiations which produced nine of these agreements. In this broader context, it makes sense that the Board would let the dispute between Local 808 and Metro-North continue in mediation. Often a mediator will let an unusually stubborn party sit with the status quo in place until the party is ready to negotiate seriously, knowing that the outcome in other mediations may influence the parties in a related dispute. This is a basic tactic in mediation and, since it poses one possible legitimate basis for holding this dispute in mediation, the court may not disturb the decision absent indications unrelated to the period of time in mediation that evince patent official bad faith.
 
 
 49
 Thus, we find no indication that the time in mediation itself evinces bad faith on the part of the Board. Only in the most extreme circumstances will a court find a period to be completely and patently unreasonable so as to indicate patent official bad faith. Such a situation has not yet come before a court in the fifty-five years of the NMB's existence.[15] This standard must obtain.
 
 2. Statements and Actions of the Board
 
 50
 The Union claims that the "continuation of mediation without foreseeable resolution which burdens one party, the Board's blatant hostility to the Section 9A procedures, and the failure of the Board to engage in active mediation ... plainly demonstrate that mediation was unsuccessful in this case" and that the Board's "violation of the statutory mandate" to proffer arbitration when mediation is unsuccessful amounts to patent official bad faith. See Brief for Appellees at 22, 29-30. To frame the claim this way, however, is to misapprehend the standard. A court may not conclude that mediation is unsuccessful, thus requiring a proffer of arbitration, merely because the parties have failed to reach settlement at the moment when the court considers the case. As we have already stated, the court is not authorized to assess, indeed is not capable of assessing, the progress of the dispute in mediation. The court must look solely to the actions of the Board to determine whether it acted in bad faith. As this court previously stated in Machinists:
 
 
 51
 It may well be that the likelihood of successful mediation is marginal. That success of settlement may lie in the realm of possibility, rather than confident prediction, does not negative the good faith and validity of the Board's effort.
 
 
 52
 425 F.2d at 541.
 
 
 53
 The District Court cites various statements by one Board member concerning his alleged "dislike" for section 9A procedures, Local 808 v. NMB, slip op. at 13, reprinted in J.A. 421, as if to suggest that the sentiments underlying these statements fueled a bad faith decision to keep the dispute in mediation. See id. at 13-14, reprinted in J.A. 421-22. "According to affidavits submitted by the Union, Board Member Wallace, who was assigned to this dispute, informed Union representatives that [the] dispute would be held in mediation 'indefinitely' in order to avoid recourse to the section 9A procedure which the Board 'disfavors.' " Id. According to the affidavit, Wallace further stated that the Union "[did] not have a right" to section 9A procedures. Id. at 14, reprinted in J.A. 422. The trial court concluded that this view "collides with the statute." Id.
 
 
 54
 We think that the trial court took the cited statements out of context and read too much into them. For example, the statement that the Union had no "right" to section 9A procedures surely need not be understood to be an indication of the Board's unwillingness to comply with the requirements of section 5. The Board member was simply stating the law. We emphasize here what this court previously determined in Machinists: unless both parties agree to proceed to arbitration, neither party has a right to cease mediation until the Board determines that mediation is unsuccessful. Cf. Machinists, 425 F.2d at 541. Here the NMB had not concluded that the mediation was unsuccessful. Thus, unless the circumstances of the dispute rise to the standards in Machinists and Delaware & Hudson, the Union had no right to an emergency board. As this court stated in Machinists:
 
 
 55
 What is voluntary about mediation ... is the decision to accept or reject the result available from the mediation process. What is involuntary about mediation under this Act is the obligation to engage in the mediation process even though a party is not unreasonable from his point of view in his conviction that further mediation is futile.
 
 
 56
 Id. Thus, a determination by the union or the railroad that mediation is pointless is of no legal significance. What is relevant is whether the statements by the Board member manifest patent official bad faith. Certainly a statement of the law as it is cannot be interpreted as a sign of patent official bad faith.
 
 
 57
 Nor do the statements indicating "disfavor" for the section 9A procedures suggest bad faith. An NMB member may legitimately indicate an unwillingness to move a dispute out of mediation in order to pressure the parties to settle. The Board may let a case sit as a mediation tactic, and it may tell parties that it will let a case sit. Congress chose this necessarily protracted means for resolving railroad labor disputes. As the Board explained, Wallace's remarks are:
 
 
 58
 simply the proper responses of a mediator who does not want to give one of the parties an indication that it no longer needs to negotiate in good faith. Parties who are told mediation may soon end have all the more reason, if they are dissatisfied with the mediation process, to harden their position and not participate in good faith.
 
 
 59
 Brief for the NMB at 33 n. 25. Furthermore, although the Union claims that the Board disfavors the section 9A procedures, the NMB has repeatedly proffered arbitration in other section 9A cases. See Barnes Declaration p 11, reprinted in J.A. 341. There has been no showing of partiality or prejudice on the part of the Board. The statements and actions of the NMB are easily explained as common mechanisms for bringing recalcitrant parties to the table.
 
 
 60
 The District Court also determined that mediation of this dispute was "doomed to failure" because "only the Union has an incentive to settle; the incentive on the Railroad is to stand firm." Local 808 v. NMB, slip op. at 13, reprinted in J.A. 421. The court, however, must look to the Board's actions in assessing whether the basis for the NMB's refusal to proffer arbitration is in patent official bad faith, not to the pressure on the parties. That one side feels disadvantaged by maintenance of the status quo is absolutely irrelevant under the law. It is the nature of disputes in mediation for one party to feel squeezed. The Supreme Court recognized this inevitable imbalance in affirming the importance of the status quo provision Local 808 seeks to circumvent:
 
 
 61
 The Act's status quo requirement is central to its design.... [S]ince disputes usually arise when one party wants to change the status quo without undue delay, the power which the Act gives the other party to preserve the status quo for a prolonged period will frequently make it worthwhile for the moving party to compromise with the interests of the other side and thus reach agreement without interruption to commerce.
 
 
 62
 Detroit & T. Shore Line R.R. v. United Transp. Union, 396 U.S. 142, 150, 90 S.Ct. 294, 299, 24 L.Ed.2d 325 (1969). It is immaterial for purposes of determining whether the Board's decision to hold the dispute in mediation is reviewable by this court that "only the Union" may have an "incentive to settle" and that "the incentive on the Railroad is to stand firm."
 
 
 63
 It is also irrelevant to the court's assessment of the Board's action in holding a dispute in mediation that either party was hardheaded. The Union points to Metro-North's regressive offer, to the difference in the parties' positions and to the lack of resolution of any of the issues as an indication of the futility of further mediation and, implicitly, as a basis for finding official bad faith in the Board's failure to recognize this futility. Brief for Appellees at 26-27. That one party, as here, makes a regressive demand or that another party requires parity proves nothing with regard to the Board's action. It merely proves that the parties are hardheaded, or, at least, that such is their posture in bargaining. Many negotiations have been settled after a union came in demanding parity. The extremeness of the parties' positions and the vigor with which a party stands by its demands is not a matter for the court's consideration.
 
 
 64
 The facts presented by Local 808 do not require the conclusion that the NMB has unreasonably delayed mediation in bad faith. The court easily can hypothesize several factors which may have led the NMB to conclude that mediation would be successful, but only after a protracted period. Not the least of these factors is that Local 808 illegally struck Metro-North on September 9, 1988, while this suit was pending, causing cancellation of rush-hour service.[16] See Metro-North Commuter R.R. v. Local 808, Int'l Bhd. of Teamsters, No. 88 Civ. 6257 (S.D.N.Y. Sept. 27, 1988). Furthermore, Metro-North claims that Local 808 not only steadfastly refused to move from its demand for parity with the LIRR, but in December 1986 the Union delivered a letter to Metro-North stating that this parity must include full wage and benefits gains included in the LIRR's ongoing contract negotiations--thus making it impossible for Metro-North to reach an agreement with Local 808 until the LIRR completed its own unrelated contract negotiations. See Brief of Appellant Metro-North at 8-9.
 
 
 65
 NMB's conduct in settling other similar disputes that arose in this time period also suggests that, as a general matter, the NMB has employed a successful mediation strategy--and suggests that they may be doing so in the instant case. According to the NMB:
 
 
 66
 What went wrong in this case is that just when the union reached the point of feeling severe pressure to do something to break the deadlock, it ran to the courthouse, rather than to the mediator. Had the union known that the courthouse door was closed, it most probably would have run to the mediator instead. The courthouse door must not serve as a pressure valve to relieve the mounting tension of the mediatory process, tension Congress was counting on to produce settlements.
 
 
 67
 Brief for the NMB at 39.
 
 
 68
 The Board's withholding of the proffer is a "crucial" tool for encouraging compromise and settlement. See, e.g., Shore Line, 396 U.S. at 149, 90 S.Ct. at 298-99; Machinists, 425 F.2d at 534. Even when a court concurs with a plaintiff's assertion that successful mediation is doubtful, it may not judicially interfere with the NMB's administrative discretion--even if there is but a "slim chance" that exhaustion of the process entrusted to the Mediation Board will succeed in achieving an agreement. See id. at 541. The facts of this case, and ones which the court may presume to exist, do not support a determination that the Board, in deciding to continue mediation, acted in "patent official bad faith."[17]
 
 CONCLUSION
 
 69
 Although the court does have jurisdiction to intervene in the mediation process upon a showing of patent official bad faith, this case does not even come close to meeting this standard for court action. Thus, the actions of the National Mediation Board in the case before us are not subject to judicial review. For the reasons discussed in the foregoing opinion, the District Court's decision is reversed and remanded for dismissal with prejudice.
 
 
 70
 So Ordered.
 
 MIKVA, Circuit Judge, dissenting:
 
 71
 The majority correctly notes that this court has prescribed a very narrow standard for reviewing National Mediation Board ("NMB" or "Board") decisions whether to terminate mediation and proffer arbitration. But a narrow standard of review should not be the functional equivalent of no review. Unfortunately, the majority opinion accomplishes that result.
 
 
 72
 In International Association of Machinists and Aerospace Workers, AFL-CIO v. National Mediation Board et al., 425 F.2d 527 (D.C.Cir.1970), Judge Leventhal announced that
 
 
 73
 [t]he Railway Labor Act taken as a whole does not fairly require the conclusion that the courts are without jurisdiction to provide a remedy if the Board continues mediation on a basis that is completely and patently arbitrary and for a period that is completely and patently unreasonable, notwithstanding the lack of genuine hope or expectation that the parties will arrive at an agreement.
 
 
 74
 Id. at 537. The following year this court revisited the mediation issue in Delaware & Hudson Railway v. United Transportation Union, 450 F.2d 603 (D.C.Cir.1971), in which Judge Leventhal indicated that in this circumstance
 
 
 75
 [t]he role of the Government officials is considered so sensitive and critical that ordinary doctrines permitting judicial action on a complaint of arbitrary delay and protraction are so drastically restricted that court relief from continuation of the process will be available, if at all, only in a most extraordinary situation bordering on patent official bad faith.
 
 
 76
 Id. at 608.
 
 
 77
 Under the majority's reading and application of the foregoing language, the NMB's decision to continue mediation is beyond judicial review except where a party seeking relief can demonstrate patent official bad faith. Such a conclusion is unwarranted from our precedent and unsatisfactory. First, by seizing upon the "patent official bad faith" language quoted above, the majority ignores the thrust of Judge Leventhal's decision in Machinists--that the NMB's decision whether to continue mediation must be reviewable--and effectively removes such decisions from judicial review. Second, the majority fails to recognize the disparity between the facts in Machinists that gave rise to the standard it applies and the facts of the case sub judice. Finally, the majority's approach renders superfluous the detailed Section 9A procedures which Congress thought important enough to construct and include in the 1981 amendment of the RLA.
 
 A. Judge Leventhal's Balance
 
 78
 Anyone reading only the majority's excerpts from Machinists would likely conclude that Judge Leventhal's sole focus was to justify excluding meddlesome courts from the delicate mediatory processes established by the RLA. In fact, Judge Leventhal announced the above-quoted standard of reviewing the NMB's termination decision only after explicitly rejecting the Board's argument that its decision was unreviewable. See Machinists, 425 F.2d at 533-37. Noting that the rule of law creates a strong presumption that agency action is reviewable by a court, that this time-tested doctrine has been reinforced by the provisions of the Administrative Procedure Act, and that the Union's right to self-help has strong constitutional and common-law underpinnings, Judge Leventhal concluded that the Board's refusal to terminate mediation was reviewable. See id. Significantly, in reaching its decision, the court in Machinists distinguished Switchmen's Union of North America v. National Mediation Board, 320 U.S. 297, 64 S.Ct. 95, 88 L.Ed. 61 (1943), in which the Supreme Court held that a district court was without jurisdiction to review a Board decision certifying representatives of a carrier's employees for collective bargaining. 425 F.2d at 535-36. The majority fails to recognize this distinction and mistakenly cites Switchmen's Union and other certification cases to support its position regarding review of NMB decisions not to terminate mediation. See Maj. Op. at 1433.
 
 
 79
 While the Machinists court recognized that the RLA procedures were designed to be drawn out, Judge Leventhal also stated that
 
 
 80
 [t]his perspective does not lead, however, to the conclusion that the process is indefinitely interminable, on the say-so of the agency alone, at least where the court may, as we think it can, reconcile both in theory and in practice a limited power of scrutiny that avoids the threat of administrative absolutism, but does not abort or trammel the administrative process.
 
 
 81
 425 F.2d at 537-38.
 
 
 82
 The majority's approach ineluctably leads to the administrative absolutism that Judge Leventhal sought to avoid. First, the majority states that a court is powerless to order the NMB to terminate mediation unless the Board's refusal to terminate is "patent official bad faith." Maj. Op. at 1434. We are instructed further that a reviewing court may not probe the reasons behind a mediator's decision to continue mediating despite apparent failure to advance toward settlement. Maj. Op. at 1435. Presumably, then, we are left to discern "patent official bad faith" from objective data like the length of the mediation in question. The majority appears to accept this, cautioning that "[o]nly in the most extreme circumstances will a court find a period to be completely and patently unreasonable so as to indicate patent offi cial bad faith." Maj. Op. at 1440-1441. However, earlier in its opinion, the majority states that "[t]he proper time for a dispute to remain in mediation is not susceptible of any objective or statistical estimation by the court." Maj. Op. at 1438 (emphasis added). How we are to assess whether the length of mediation has exceeded reasonable bounds remains a mystery. I am left to conclude that absent some clear evidence of fraud or corruption, the NMB's refusal to terminate mediation is effectively beyond a reviewing court's remedial powers. Instead, under the majority's scheme, a dispute may be kept in mediation interminably on the "say-so" of the Board alone. Judge Leventhal's balance is gone: the Board's decision is effectively unreviewable; the parties' constitutionally-rooted right to engage in self-help is rendered inaccessible; administrative absolutism reigns.
 
 B. Factual Disparity
 
 83
 The majority employs the standard of review developed in Machinists without regard for the factual differences between that case and the case sub judice. While I acknowledge that language--and particularly a "test" or a "standard"--often takes on an existence independent of the factual situation that generated it, I think that it is particularly useful to examine the events to which Judge Leventhal was responding in Machinists. Machinists involved a dispute between the International Association of Machinists and Aerospace Workers (the "Union") and National Airlines, Inc. ("National"). The parties exchanged notices of proposed changes in the collective bargaining agreement between the Union and National on October 31, 1968. After initial conferences between the parties failed to produce a settlement, National appealed for the assistance of the NMB on December 16, 1968. Before the NMB had assigned a mediator to the dispute, both parties engaged in self-help. On February 27, 1969, the Union began an action in federal district court, seeking an injunction compelling the NMB to assign a mediator. Before the court could rule on this motion, the Board assigned a mediator to the dispute. After the Board replaced the mediator and several mediation sessions had been held, the Union amended its complaint to seek an injunction directing the Board to proffer arbitration. On August 4, 1969, the district court ordered the Board to proffer arbitration. The NMB appealed the district court's order and this court reversed. See Machinists, 425 F.2d at 531-33.
 
 
 84
 In reversing, the Machinists court emphasized certain factors supporting its decision. In particular, the court noted that although the time spent in mediation (6 months) was "more than customary," this was excusable because "this dispute involved a large number of issues, some of them complex, and ... the time required to mediate successfully other difficult cases had been even greater." 425 F.2d at 541. The court stressed that of those issues to which substantial time had been given in mediation, "approximately 40% had been resolved." Id. Finally, the court noted that the Board's inability to resolve more of the issues might have been attributable to the short time that the parties had attempted to resolve the dispute in conference before seeking the Board's mediatory assistance. Id. When these factors are combined with the fact that the entire mediatory process had been conducted "under the shadow of litigation," id. at 542, it is no wonder that this court was extremely reluctant to interfere with this ongoing effort at settlement. The court was correct to note that the "failure or inconclusiveness [of the mediation] does not demonstrate similar lack of success for a mediation process conducted without the artificial pressure and distortion of an overhanging litigation." Id.
 
 
 85
 The facts of the case sub judice are very different. If we deduct the time that this case has been in litigation, the parties were in mediation from October 29, 1986 through June 24, 1988--twenty months free from the pressures of litigation that might explain failure to make any progress. Since February 28, 1988, there have been no joint mediation sessions. Further, unlike Machinists, the parties in this case conferenced for almost ten months (August 28, 1985 through June 10, 1986) before requesting the NMB's assistance. During this entire time, not one of the issues confronting the parties has been resolved, and the last offer made by Metro-North before litigation began was regressive from the previous offer that the Union's membership had rejected overwhelmingly five weeks earlier. In short, none of the objective indicia of progress that counseled restraint in Machinists is present in this case.
 
 
 86
 In contrast, this case presents several compelling reasons for affirming the district court's decision. First, this case has been in mediation for longer than all but one other Section 9A dispute. Although the majority dismisses any distinction between Section 9A disputes and other disputes under the RLA, I find cogent the district judge's reasoning for comparing the length of mediation in this case only with the mediation periods of other Section 9A cases. The Board has acknowledged that one of the benefits of an indefinite period of mediation is that it can use its power to terminate mediation in two ways. By withholding termination, the Board can encourage the party seeking change to compromise, as the status quo obtains during the mediation process. By threatening termination of mediation, the Board can pressure the non-moving party to bargain, lest the moving party be allowed immediate resort to self-help. In non-Section 9A cases, this creates a dynamic in which the Board's power to terminate mediation weighs upon both parties to the negotiations. The statutory framework under Section 9A, however, necessarily diminishes much of the leverage that the Board has in encouraging a non-moving party to reach agreement. By its terms, Section 9A allows this party to extend the status quo, even after the mediation process has failed, by an additional eight months. Where resort to self-help does not pose the same risks of immediacy, the dynamics of negotiation--including when the Board deems it reasonable to terminate mediation--logically would be altered. Comparisons between mediation periods are meaningful only to the extent that the dynamics of the mediations in question are reasonably parallel. Therefore, the district judge's decision to compare the length of time this case has been in mediation with the mediation periods of other Section 9A cases seems appropriate.
 
 
 87
 The factors indicating that this mediation has no hope of success, that its continuation uniquely burdens the Union, and that it extends an unintended windfall to Metro-North are numerous: this is one of the longest Section 9A mediations on record; Board Member Wallace made statements to the Union indicating that the Board did not favor Section 9A procedures; this dispute has lasted longer than the collective bargaining agreement that gave rise to this action; in almost two years of pre-litigation mediation and ten months of pre-mediation conferences, not a single issue separating the parties has been resolved; and Metro-North's final offer was regressive. Individually, any one of these factors fails to move this dispute into the admittedly narrow class of cases in which judicial intervention would be appropriate. Taken together, these individual indicators of mediatory failure coalesce into an unmistakable message to the Board and to this court: it is time to move on to the elaborate procedures that Congress has provided in Section 9A for cases in which mediation has not worked and manifests no reasonable possibility of success. This case is not Machinists.
 
 C. Statutory Scheme
 
 88
 My final and most serious objection to the majority's approach in this case is that it renders superfluous the elaborate procedures that Congress enacted in Section 9A. Congress, in the RLA, created a very thorough procedure to avoid, alleviate, or at least delay the hardships and economic chaos that could result from strikes in the transportation industry. The majority opinion points out that both the railroads and their unions were very deeply involved in the drafting of the statute. The RLA was aimed at major disputes, the kind that both sides dug in on, as opposed to disputes about the interpretation or administration of contractual terms to which the parties had agreed.
 
 
 89
 In 1981, Congress amended the RLA to provide additional procedures for resolving major disputes within publicly funded commuter railroads. This amendment permits either party to the dispute to extend the status quo period under the statute by as much as 8 additional months by invoking not one, but two presidential emergency boards once the ordinary means for resolving major disputes under the RLA has been exhausted. As a result of this congressionally ordained legislative framework, major disputes between a railroad and its union are sequenced very specifically as to time and procedure--as the majority opinion freely acknowledges.
 
 
 90
 When it comes to applying this time-specific plan to the instant dispute, however, the court cuts up the procedure in a way totally unblessed by Congress in the statute. Under the court's reading of the statutory scheme, the parties must follow the initial procedures very meticulously: notices must be served; the disputants must make a show of being in a mediative mode. But then, if either or both parties become intransigent (as often happens in major labor disputes), the majority vacates all of the remaining means of resolution envisioned by Congress--the proffer of arbitration, the availability of the two emergency boards, and the selection of the most reasonable settlement offer by the second emergency board--and converts the mediation board into a Board of the Status Quo. This Status Quo Board can hold the moving party hostage apparently forever--subject only to review for fraud or corruption. This is the procedure the majority finds Congress intended and, presumably, the procedure to which the union and employer factions agreed. One can only imagine the outcry that would have been heard throughout Congress if any Member had proposed to write into the statute the specific procedure framed by the majority. I have no doubt that strong opposition would have come from the railroads as well, as there is no certainty that the NMB would always use its permanent status quo power to benefit management.
 
 
 91
 Logic dictates that Congress would not have bothered to design the comprehensive and intricate post-mediation procedures of Section 9A if it had perceived that the NMB could keep a dispute in mediation forever absent fraud or corruption. If Congress' intention in enacting Section 9A was to prolong the time before either party could resort to self-help, as the majority suggests, the finite extension of the status quo that Section 9A permits is at most superfluous if the Board could keep the dispute in mediation interminably on its own say-so. Because we must credit Congress with some reasoned basis for enacting Section 9A, we are compelled to conclude that Congress did not view the Board's power to retain a dispute in mediation to be virtually unlimited.
 
 D. Conclusion
 
 92
 All agree that courts should not freely intervene in a Board decision to hold a dispute in mediation. But, consistent with Machinists and the procedures of the RLA as enacted by Congress, a trial judge must have discretion in measuring the reasonableness of the Board's delay in acknowledging mediatory failure and moving on to arbitration and the other procedures mandated by Section 9A. Many times both sides will want to mediate. Many times one side or the other will fear the next phase of dispute resolution provided for in the RLA's detailed sequence. Many times the resisting party will not be capable of self-help. In any event, it is not for this court to rewrite a statute and impose our values favoring unlimited mediation on this thorny and contentious field. Congress developed and mandated the statutory sequence; there is no place for imposing a half-time delay of unknown and unknowable duration in a statutory scheme that Congress worked out in such detail. Where, as here, the trial court legitimately concluded that there was no evidence of progress toward resolving a protracted dispute and that prolonging the status quo weighed unconscionably upon one party to this dispute, the clear consequences of the statute ought to be invoked. I dissent.
 
 
 
 [1]
 Local 808 served the notice pursuant to RLA Sec. 6, which requires carriers and representatives of the employees to give at least 30 days' written notice of an intended change in agreements affecting rates of pay, rules or working conditions, and the time and place for the beginning of conference between the representatives of the parties. See 45 U.S.C. Sec. 156 (1982)
 
 
 [2]
 See H.R.Rep. No. 328, 69th Cong., 1st Sess. 1 (1926); Chicago & N.W. Ry. v. United Transp. Union, 402 U.S. 570, 589, 91 S.Ct. 1731, 1741, 29 L.Ed.2d 187 (1971) (Brennan, J., dissenting); Texas & N.O.R.R. v. Brotherhood of Ry. & S.S. Clerks, 281 U.S. 548, 563-64, 50 S.Ct. 427, 431, 74 L.Ed. 1034 (1930)
 
 
 [3]
 "Major disputes" are those arising "over the formation of collective agreements or efforts to secure them." Elgin, J. & E. Ry. v. Burley, 325 U.S. 711, 723, 65 S.Ct. 1282, 1290, 89 L.Ed. 1886 (1945), reh'g granted, 326 U.S. 801, 66 S.Ct. 86, 90 L.Ed. 488 (1945), aff'd, 327 U.S. 661, 66 S.Ct. 721, 90 L.Ed. 928 (1946); see also Burlington N.R.R. v. Brotherhood of Maintenance of Way Employees, 481 U.S. 429, 432, 107 S.Ct. 1841, 1844, 95 L.Ed.2d 381 (1987) (reiterating Elgin v. Burley definition of major disputes); Consolidated Rail Corp. v. Railway Labor Executives' Ass'n, --- U.S. ----, 109 S.Ct. 2477, 2480, 105 L.Ed.2d 250 (1989) (same). Such disputes "are left to the machinery of noncompulsory adjustment under the general supervision of the National Mediation Board." Machinists, 425 F.2d at 533; see also Consolidated Rail Corp., 109 S.Ct. at 2480; Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co., 394 U.S. 369, 378, 89 S.Ct. 1109, 1115, 22 L.Ed.2d 344 (1969)
 
 
 [4]
 The NMB may also proffer its services sua sponte if it finds a labor emergency to exist. See 45 U.S.C. Sec. 155 First (1982)
 
 
 [5]
 Non-commuter carriers and their employees have no such power to compel the creation of an emergency board; for them, creation of an emergency board is left to the discretion of the President. See RLA Sec. 10, 45 U.S.C. Sec. 160 (1982). Under section 10, if arbitration is rejected and the dispute "threaten[s] substantially to interrupt interstate commerce to a degree such as to deprive any section of the country of essential transportation service," the President may, in his discretion, create an emergency board to investigate and report on the dispute. Id. After creation of a section 10 Emergency Board, recourse to self-help is effectively prohibited for 60 days. See id
 
 
 [6]
 Under section 9A, any party to the dispute may act to require the President to create an emergency board by executive order. See 45 U.S.C. Sec. 159a(b), (c)(1) (1982). In addition, the Governor of any state through which the service operates may act to require the President to create an emergency board. See id. The parties may not change the status quo except by agreement for 120 days from the creation of this, first, emergency board, see 45 U.S.C. Sec. 159a(c)(1) (1982); and if the parties have not reached a settlement at the end of the 120-day period, the President must, at the request of any party to the dispute, establish another emergency board. See 45 U.S.C. Sec. 159a(e) (1982). The parties must submit final settlement offers to this second emergency board which selects the offer it finds most reasonable, and although the parties are not obligated to accept the offer the second emergency board selects, failure to adopt it results in the loss of benefits. See 45 U.S.C. Sec. 159a(f), (g), (i), (j) (1982). Because waiting periods attend each step, after the creation of the first section 9A emergency board, resort to self-help is effectively prohibited until the end of the process--a period that can last up to 240 days from the date the President created the first emergency board. See 45 U.S.C. Sec. 159a(c)-(j) (1982). Once the 240-day period is over, however, either party may engage in self-help
 
 
 [7]
 Section 5 First of the Railway Labor Act, as amended, provides in relevant part:
 The parties, or either party, to a dispute between an employee or group of employees and a carrier may invoke the services of the Mediation Board in any of the following cases:
 (a) A dispute concerning changes in rates of pay, rules, or working conditions not adjusted by the parties in conference....
 ....
 [T]he said Board ... shall use its best efforts, by mediation, to bring them to agreement. If such efforts to bring about an amicable settlement through mediation shall be unsuccessful, the said Board shall at once endeavor as its final required action ... to induce the parties to submit their controversy to arbitration, in accordance with the provisions of this chapter.
 45 U.S.C. Sec. 155 First (1982) (emphasis added).
 
 
 [8]
 The Supreme Court long ago determined in the representation context that the role of the courts is extremely limited. See Switchmen's Union v. NMB, 320 U.S. 297, 300-05, 64 S.Ct. 95, 96-99, 88 L.Ed. 61 (1943) (concluding that the district court was without the power to review the NMB's issuance of a certification of representation); General Comm. of Adjustment v. Missouri-Kan.-Tex. R.R., 320 U.S. 323, 336, 64 S.Ct. 146, 152, 88 L.Ed. 76 (1943) (concluding that Congress fashioned an exclusive administrative remedy in the NMB to resolve jurisdictional disputes between unions or among groups of employees)
 
 
 [9]
 The factual context of Delaware & Hudson is very different from that of Machinists, and from the case at bar. In Delaware & Hudson, the railroad was seeking to enjoin the union from striking, after the parties had been through all the procedures outlined in the RLA: conference, mediation, request by the NMB for the parties to submit to arbitration, and a President-appointed emergency board. See 450 F.2d at 605-06. The court determined that even when the parties have exhausted the RLA procedures and the right of strike or self-help comes into existence, the parties are obligated to treat each other responsibly, consistent with the conduct of collective bargaining. See id. at 622. The court concluded that the union could strike, but that it needed to give reasonable notice before striking. See id. at 622-23
 
 
 [10]
 See, e.g., Machinists, 425 F.2d at 539-42. A mediator's "exploratory conversations on disputed issues are off the record. His public pronouncements are largely on procedural aspects of negotiations, such as expressions of foreboding that not enough progress is being made or optimistic observations that the parties are trying very hard, that some progress is being made, and that round-the-clock sessions are being scheduled." P. PRASOW & E. PETERS, ARBITRATION AND COLLECTIVE BARGAINING 234 (1970)
 
 
 [11]
 This restriction is addressed in testimony on the RLA by representatives of management and labor. The principal spokesperson for management testified before the Senate that:
 the board of mediation is intended to continue to be regarded by both parties as an impartial body whose services will be valuable, and bring them together.... They must continue with their powers of conciliation unimpaired, and they could not do that if they are to render judgment.... [T]here never was a purpose to make the board of conciliation a fact-finding commission or to have a report on the merits.
 Railway Labor Act: Hearings on S.2306 Before the Senate Comm. on Interstate Commerce, 69th Cong., 1st Sess. 13 (1926) (testimony of A.P. Thom). The principal spokesperson for labor similarly testified that "[t]he board of mediation, to preserve its ability to mediate year after year between the parties, must not be given any duties to make public reports condemning one party or the other, even though the board may think one party is wrong.... Their duty is that of remaining persuaders." Railroad Labor Disputes: Hearings on H.R. 7180 Before the House Comm. on Interstate and Foreign Commerce, 69th Cong., 1st Sess. 18 (1926) (testimony of Donald R. Richberg). Richberg further indicated that the "fundamental cause" of the Labor Board's, the NMB's predecessor, failure was its loss of persuasive authority because of its obligation to deliver public opinions for and against the parties to a dispute. See id.
 
 
 [12]
 The Board's success in mediating disputes is worthy of note. The NMB has resolved, without interruption of interstate commerce, 97% of the more than 12,000 disputes that have been referred to it since its creation in 1934, and 98.5% of the disputes referred to it since 1978. National Mediation Board's Motion to Dismiss, or, in the Alternative, for Summary Judgment, reprinted in J.A. 339-40
 
 
 [13]
 The NMB notes as an initial matter that, even during the four-month period, there were separate mediatory contacts although no joint mediation sessions were held. See Brief for the NMB at 27
 
 
 [14]
 The record indicates that, between August 1986 and March 1988, Metro-North reached agreement with 17 of 19 unions. All these agreements were ratified. Metro-North reached an agreement with the eighteenth union through the collective bargaining process, following dismissal of a suit to terminate mediation, similar to the one Local 808 brought in this case. See Metro-North Commuter R.R. v. Railroad Police Benevolent Ass'n, No. 88 Civ. 6026 (S.D.N.Y. Jan. 20, 1989) (dismissed without a written opinion and without prejudice to renewal)
 
 
 [15]
 Congress established the "National Mediation Board" by a 1934 amendment to the RLA, see Pub.L. No. 442, 48 Stat. 1185, 1193-97 (1934), replacing the "Board of Mediation" created by the Railway Labor Act of 1926, see Pub.L. No. 257, 44 Stat. 577, 579 (1926)
 
 
 [16]
 The District Court for the Southern District of New York granted a preliminary injunction against the strike and the refusal to work overtime, ruling that the Union unlawfully attempted to alter the status quo during mediation. Metro-North Commuter R.R. v. Local 808, Int'l Bhd. of Teamsters, No. 88 Civ. 6257 (S.D.N.Y. Sept. 27, 1988)
 
 
 [17]
 Because we determine that the District Court lacked jurisdiction over this case on the grounds that there was no showing of official bad faith, we need not reach a different issue raised by Metro-North. Metro-North argues that section 8 of the Norris-LaGuardia Act, 29 U.S.C. Sec. 108 (1982), bars the Union from seeking injunctive relief because it illegally struck and because it refused to arbitrate when the NMB proffered arbitration. See Brief of Appellant Metro-North at 30-31